COMMONWEALTH OF VIRGINIA *v.* STATE OF WEST VIRGINIA.

IN EQUITY.

No. 2. Original. Argued April 27, 28, 29, 1915.—Decided June 14, 1915.

This controversy being one between States, referred to this court in reliance upon the honor and constitutional obligations of the parties, it has been determined only after the amplest opportunity for hearing and with full recognition of every existing equity.

West Virginia is entitled to have the assets in the Virginia sinking fund

and those specifically appropriated for payment of the debt applied in reduction of her share of the debt in the same proportion (23½%) as she is liable therefor.

The proper date for the division of the assets in the sinking fund and the taking account of the indebtedness to be divided between Virginia and West Virginia is January 1, 1861, as fixed by the contract.

In proving market value, accredited price-currents, lists and market reports, including those published in trade journals and newspapers which are considered trustworthy are admissible in evidence.

Shares of stock represent the proportionate interest of the shareholders in the corporate enterprise; and a rule that this interest should, in the absence of supporting testimony, be taken as actually worth the par of the shares would be artificial, and not justified by any exigency in the administration of justice.

An asset consisting of a debt due in a Confederate State which was paid in full in Confederate money should not for that reason be valued in adjusting accounts as of 1861 at less than the face value.

In estimating the value of bank stocks at book value an allowance of five per cent. for liquidation and realization is proper.

After considering all the exceptions to the Master's second report in this case, *held* that there should be deducted from West Virginia's share (23½%) of the principal debt of Virginia on January 1, 1861, already fixed, 220 U. S. 1, 35, at $7,182,507.46, the same proportionate part of the value of the assets in the sinking fund on that date and retained by Virginia amounting to $2,966,885.18, so that West Virginia's net share of the debt, is now fixed at $4,215,622.28 exclusive of interest.

A contract is to be interpreted according to its true intent although varied conditions may have during the lapse of years varied the form of fulfilment; in this case there are no equities which destroy the contract claim.

In a contract between sovereign States the questions of whether the debtor party is liable for interest on ascertainment of the amount due and rate of interest and period from which it should be computed are to be determined by the fair intendment of the contract itself.

It is not in derogation of its sovereignty that a State be charged with interest if the agreement so provides.

A contract on the part of a State to assume an equitable proportion of an interest-bearing debt means the taking over of the liability for interest as well as principal.

In determining what rate of interest West Virginia should pay on the

proportion of the debt of Virginia assumed, the action of Virginia in regard to interest on the debt should be considered and under all the circumstances of the case *held*, in fixing the equitable proportion of West Virginia, that her part of the principal should be placed on a three per cent. basis as of July 1, 1891, with three per cent. per annum interest from that date, and with four per cent. per annum interest from July 1, 1861, to July 1, 1891, making a total of interest to July 1, 1915, of $8,178,307.22 and the total of the debt $12,393,929.50.

The decree shall provide for interest on five per cent. per annum on the total amount awarded by the decree from the date of entry.

THE facts, which involve the final adjustment between Virginia and the State of West Virginia and the determination of the equitable proportion of the debt of Virginia which the State of West Virginia agreed to assume and the liability of the latter for interest thereon, are stated in the opinion.

*Mr. Holmes Conrad* and *Mr. Sanford Robinson* for the bondholding creditors.

*Mr. Randolph Harrison*, with whom *Mr. John Garland Pollard*, Attorney-General for the State of Virginia, and *Mr. Wm. A. Anderson* was on the brief, for complainant.

*Mr. A. A. Lilly*, Attorney-General of the State of West Virginia, and *Mr. John H. Holt*, with whom *Mr. Chas. E. Hogg* was on the brief, for defendant.

MR. JUSTICE HUGHES delivered the opinion of the court.

Upon the hearing in 1911, it was determined that the public debt of Virginia, as of January 1, 1861,—of which West Virginia agreed to assume 'an equitable proportion'—amounted to $33,897,073.82; that, in view of a reduction secured by Virginia and with the consent of her creditors, the amount to be apportioned was $30,563,861.56; that the apportionment should be made according to the estimated value of the property of the

two States at the time of their separation, June 20, 1863; and that upon this basis the proportion of West Virginia was 23.5 per cent., making her share of the principal of the debt $7,182,507.46. While the fundamental issues were thus decided, the controversy was not completely determined. In view of the consideration due to the character of the parties, and of the fact that the cause was 'a quasi-international difference referred to this court in reliance upon the honor and constitutional obligations of the States concerned,' it was deemed advisable to go no farther at that stage but to afford opportunity for conference and adjustment. Accordingly, the question of interest was left open. *Virginia* v. *West Virginia*, 220 U. S. 1, 35, 36.

At the following Term, a motion on the part of Virginia that the court should proceed at once to final decree was denied in the light of the public reasons urged for the granting of further time. 222 U. S. 17. Another application of this sort was made by Virginia in November, 1913, and was again refused, and the cause was assigned for final hearing in April, 1914. 231 U. S. 89.

At that time, West Virginia as a result of her investigations asked permission to file a supplemental answer asserting the existence of credits, which she claimed as against the portion of the principal debt assumed, and also alleging grounds why she should not be charged with interest. Without expressing an opinion as to the propriety of allowing any of the described items of credit, and refraining from applying the ordinary and more restricted rules of procedure which would govern in cases between private litigants, the court granted the application to the end that this public controversy should be determined only after the amplest opportunity for hearing and with full recognition of every equity that might be found to exist. The subject-matter of the supplemental answer, considered as traversed by Virginia, was at once referred to Charles E. Littlefield, Esq., the Master before

whom the former proceedings had been had, with directions to hear and consider such pertinent evidence as West Virginia might offer, and such counter-showing as Virginia might make, and to report the evidence with his conclusions deduced therefrom, together with a statement of his views 'concerning the operation and effect of the proof thus offered, if any, upon the principal sum found to be due by the previous decree of this court,'—that decree meanwhile to remain wholly unaffected. 234 U. S. 117.

The Master's report has been filed, all the questions remaining to be determined have been fully argued, and the case is before us for final decree.

At the outset, the Master states that the extensive investigation involved in the later reference, with respect to the existence and the value of the various assets claimed as credits, was then prosecuted for the first time; and that so far as these items had been referred to in the earlier proceeding, it was for an entirely different purpose in the main. The Master reports that, in his view, the assets as detailed by him were applicable according to their value as of January 1, 1861, to the public debt of Virginia which was to be apportioned as of that date; that the value of these assets then amounted to $14,511,945.74, of which West Virginia's share—23½ per cent.—would be $3,410,307.25. That if this amount were to be credited to her in reduction of her liability there should be offset certain moneys and stocks received by her from the Restored Government of Virginia aggregating $541,467.76, leaving a net credit to West Virginia of $2,868,839.49. This would reduce West Virginia's liability for principal from $7,182,507.46 to $4,313,667.97. The Master also concluded that West Virginia by virtue of her contract with Virginia is liable for interest from January 1, 1861, the date as of which her share of the principal is determined.

The ground for the allowance of the credits is that the moneys and securities in question had been specifically dedicated to the payment of the public debt. The moneys embraced cash in the sinking fund on January 1, 1861, and the securities had been purchased with proceeds of the debt. In 1838, the General Assembly of Virginia in authorizing the negotiation of loans provided that the stock of any joint stock company purchased with the money so borrowed, together with the dividends and other net income which might accrue therefrom to the Commonwealth, should be, and were, 'appropriated and pledged' for the payment of the interest and for the final redemption of the principal borrowed. Act of April 9, 1838, § 3. The constitution of 1851 directed the creation of a sinking fund which was to be applied to the debt (Art. IV, § 29) and, with respect to the State's stocks, thus provided: "The General Assembly may, at any time, direct a sale of the stocks held by the Commonwealth in internal improvement and other companies; but the proceeds of such sale, if made before the payment of the public debt, shall constitute a part of the Sinking Fund, and be applied in like manner." *Id.*, § 30. In 1853, the legislature in establishing the sinking fund enacted a corresponding provision. Act of March 26, 1853, § 3. The question then is not one of the division of public property, merely because of its character as such. In the light of the origin and nature of the investments which the Master has reviewed and valued, and of the provisions of the constitution and statutes of the State, it is clear that these particular assets must be regarded as a fund specially devoted to the payment of the debt to be apportioned. In this view, West Virginia is entitled to have these assets taken into account in fixing the amount of her liability. It cannot be conceived that, being held for the undivided debt, it was intended that they should be applied exclusively to Virginia's share. As West Virginia is to bear 23½ per

cent. of the debt as it existed on January 1, 1861, she should be credited with a similar part of the fund, fairly valued, which had been pledged for its discharge. This equity is inherent in the obligation.

Both parties have filed exceptions to the report of the Master. The first two exceptions on the part of Virginia, and of her committee of bondholding creditors, raise the same point,—that is, that the Master erred in selecting January 1, 1861, instead of June 20, 1863 (the date of separation), as the time as of which the value of the assets should be ascertained.

The question must be determined by reference to the terms of the contract between the two States (220 U. S., p. 28) upon which the liability is based. The undertaking is found in the provision of the constitution of West Virginia, which conditioned her admission to the Union. It is as follows (Art. VIII, § 8):

"An equitable proportion of the public debt of the Commonwealth of Virginia prior to the first day of January in the year one thousand eight hundred and sixty-one, shall be assumed by this State; and the Legislature shall ascertain the same as soon as may be practicable, and provide for the liquidation thereof, by a sinking fund sufficient to pay the accruing interest, and redeem the principal within thirty-four years."

It is not to be doubted that this fixed January 1, 1861, as the date of cleavage with respect to the amount of the debt to be apportioned. It is not important that this date was prior to the separation of the two States. It was competent for the parties to fix a date, and they did so. The explanation of the selection may readily be found in the course of events, but it is sufficient to note that the selection was made. The ascertainment of the ratio of division must not be confused with the fixing of the amount to be divided. With regard to the former, we decided that we must look to the time when West Virginia became

a State, that is, in determining the general resources of the two States when the separation was effected. 220 U. S., p. 34. But we did not refer to that time for the purpose of ascertaining the indebtedness which was to be apportioned. That, it was definitely stipulated by the agreement, was the debt as it stood on January 1, 1861. *Id.*, p. 27. It follows that credits then existing were to be applied as of that date. Otherwise, the net amount which equitably was to be divided would not be determined. For example, it is not disputed that on January 1, 1861, there were over eight hundred thousand dollars in cash in the sinking fund. If the amount of the debt was to be ascertained as of that date for the purpose of equitable division, the sinking fund would have to be credited as of the same date, either in reduction of the debt or by crediting to each State her proper share according to her proportion of the debt. We know of no method of accounting which would settle and finally divide the debt as of January 1, 1861, and credit the sinking fund as of 1863. The same is true of the assets which had been specifically appropriated for the payment of the debt. The very ground of the credit of their value implies that it should be allowed as of the time fixed for the taking of the account of the indebtedness to be apportioned. The exceptions referred to cannot be sustained.

There is the further exception presented by the bond-holding creditors (not by Virginia) to the refusal of the Master to hold that Virginia should not be charged with a value in excess of the price or amount that she actually received. The argument treats the ultimate realization by Virginia as the criterion. We must again refer to the contract. It was not intended to create and it did not create for the two States a partnership or community of interest in these assets, or provide that they should be held in trust by Virginia for West Virginia. It contemplated that each State should assume a fixed amount of

the debt,—not that there should be equitable co-ownership of a sinking fund to be liquidated for joint account. It did not look to a future accounting for moneys realized after the vicissitudes of civil war. There was to be a complete and final determination of West Virginia's 'equitable proportion' of the debt existing on January 1, 1861, and the account with Virginia was to be closed. As to this share of West Virginia, she was to establish her own sinking fund. There was, however, the equity arising from the fact that moneys and securities had been specially set apart for the payment of the debt. The facts as to this were well known and, as we have said, it cannot be supposed that West Virginia's fair and just proportion was to be fixed on a basis which denied her an appropriate share in the fund thus constituted, applying that which was meant for the whole only to Virginia's part. In view of the situation of the parties, and of the equitable adjustment which was contemplated, the question necessarily becomes one of valuation as of the selected date, and not solely of the amount realized in the later years.

It is argued that we should take the ultimate proceeds whenever they were received, and by discounting these upon a six per cent. basis find their value as of January 1, 1861 (assuming that to be the proper date), and credit the amount thus ascertained as the then value of the securities. This contention cannot be maintained. It would seem to be clear that such a method could only be justified in exceptional instances, in the absence of other and better evidence. The amount of the ultimate proceeds may have probative force in particular cases, according to the proved circumstances, but it is not the criterion of the value to be determined.

We are thus brought to the findings as to value. The various items, and the amounts allowed, are classified by the Master (following the arrangement of the supplemental answer) as follows:

| | |
|---|---:|
| Class A, Cash in sinking fund,....... | $819,250.03 |
| Class B, Stock of Richmond, Fredericksburg & Potomac Railroad Company,..................... | 323,167.36 |
| Class C, Various other stocks, loans, etc. (19 items)................. | 7,352,594.65 |
| Class D, Interest and dividends accruing prior to January 1, 1861, and subsequently received, (20 items) ..... | 345,554.80 |
| Class E, Bank stocks.............. | 3,802,357.48 |
| Class F, Stocks sold to Atlantic, Mississippi & Ohio Railroad Company.. | 204,688.42 |
| Class G, Stock of James River & Kanawha Company................... | 1,664,333.00 |
| TOTAL.................... | $14,511,945.74 |

Virginia and the bondholding creditors do not except to these findings on the basis of January 1, 1861, with respect to Class A, Class C (items 5 to 18, inclusive), and Classes D, E, and F. They except to the findings as to the value of the securities in Class B, Class C (items 1 to 4, inclusive, and item 19), and Class G. West Virginia has filed exceptions to the findings as to the same items (save item 19 in Class C) and also excepts to the findings of value in ten other instances. There are no exceptions on either side with respect to Class A and Class D.

To avoid repetition, the exceptions of both parties will be considered in connection with each item in dispute.

1. *Class B. Stock of the Richmond, Fredericksburg & Potomac Railroad Company.* Virginia held 2752 shares, of the par value of $275,200, out of a total stock issue of $1,116,100. This stock she still owns.

In connection with this item and the other valuations to which they except, Virginia and the bondholding creditors complain that the Master disregarded published

quotations and based his findings upon book value and earnings. The quotations referred to appeared in the 'Richmond Dispatch' a newspaper of high reputation, and embraced reports of sales by brokers of good standing. It is unquestioned that in proving the fact of market value, accredited price-current lists and market reports, including those published in trade journals or newspapers which are accepted as trustworthy, are admissible in evidence. *Cliquot's Champagne*, 3 Wall. 114, 141; *Fennerstein's Champagne*, 3 Wall. 145; *Chaffee v. United States*, 18 Wall. 516, 542; *Sisson v. Cleveland & Toledo Ry.*, 14 Michigan, 489; *Cleveland & Toledo Ry. v. Perkins*, 17 Michigan, 296; *Whitney v. Thacher*, 117 Massachusetts, 523; *Fairley v. Smith*, 87 N. Car. 367; *Moseley v. Johnson*, 144 N. Car. 257; *Nash v. Classon*, 163 Illinois, 409; *Washington Ice Co. v. Webster*, 68 Maine, 449; *Harrison v. Glover*, 72 N. Y. 451. We need not stop to review the decisions that are cited with respect to the extent of the preliminary showing of authenticity that is required (*Whelan v. Lynch*, 60 N. Y. 469; *Nor. & West. R. R. v. Reeves*, 97 Virginia, 284; *Fairley v. Smith, supra*) inasmuch as all the quotations asserted to have any bearing were received in evidence by the Master. We are now simply concerned with the question of their importance or weight, and whether they can be deemed to have the controlling effect that is sought to be ascribed to them.

Thus, with respect to the stock of the Richmond, Fredericksburg & Potomac Railroad Company, the published quotations were extremely meager. There was no stock exchange at Richmond and the transactions shown are very few. There is mention of two sales at 80 in November, 1860, but the number of shares sold is not stated or whether the sales were public or private. There are no reports of earlier sales or of any between that time and April, 1863. During this period, no quotations appear under the head of 'Bid' or 'Asked.' In Decem-

ber, 1860, and also in the early part of 1861, under the head of 'Quoted' there is mention of 76½ and 77 'Last sales,' but nothing appears at these times under the head of 'Sales,' and the time and amount of the 'last sales' referred to are not given. In short, we have very infrequent transactions, of unknown significance, which fall short of furnishing a satisfactory indication of the value of the large block of stock held by the State.

The fact, however, that there was no sufficient proof of market value was not an insuperable obstacle to the making of a fair valuation. It was clearly proper to introduce evidence tending to show the intrinsic value of the shares. *Nelson* v. *First National Bank,* 69 Fed. Rep. 798, 803; *Crichfield* v. *Julia,* 147 Fed. Rep. 65, 73; *Henry* v. *North American Construction Co.,* 158 Fed. Rep. 79, 81; *Murray* v. *Stanton,* 99 Massachusetts, 345; *Industrial Trust, Ltd.,* v. *Tod,* 180 N. Y. 215, 232; *State* v. *Carpenter,* 51 Oh. St. 83; *Redding* v. *Godwin,* 44 Minnesota, 355; *Moffitt* v. *Hereford,* 132 Missouri, 513. For this purpose, resort was had to corporate accounts and reports of the company's affairs. With respect to the competency of the proof (in the case both of this company and of others, the value of whose shares was in question) in the absence of supporting testimony as to the facts recited, the Master refers in his report to the provisions of the statutes of Virginia. By the act of March 15, 1856, it was provided that every railroad corporation in which the Commonwealth was interested as a stockholder or creditor should annually make report to the Board of Public Works showing the condition of the property and containing full information with respect to capital stock, indebtedness, details of cost, physical characteristics, equipment, statistics of transportation, and a detailed statement with an appropriate classification of earnings and expenses. By the same act reports were required from canal and navigation companies. The Master says: "The State was a stockholder in all of these

corporations. By her statute she required the returns to be made on oath for the information of the public. She published them for public information as true, and the publications are now a part of her public records." As such they were deemed to be admissible against her in this litigation. They were, of course, not regarded as conclusive, and the question of their weight was reserved.

In the case of the road now under consideration, the book value, based on the cost of the railroad and net current assets, was practically 150 as of January 1, 1861. It had increased from 144.2 on March 31, 1859, to 150.4 on March 31, 1861. This book value was deduced from the annual trial balances as of March 31 in each year, purporting to show assets and liabilities. The greater part of the surplus was invested in construction. There was evidence that the cost was carried forward carefully from year to year, generally under classified headings, and it did not appear to contain items that were not legitimate. The annual reports indicated the making of repairs and renewals to keep the road in good condition. Between 1848 and 1861, there were outlays amounting to $132,841.93, largely for added equipment and improvements, which had been charged to operating expenses. As to earnings, it appeared that the road had been built about 1837. There had been paid in dividends to March 31, 1861, $1,099,280.64. There were no dividends in 1856, 1857, and 1858. One-half of the dividends in 1854, and the dividends of 1855, 1859 and 1860, were paid in bonds; they were deducted in arriving at book value. The dividends for the eleven years ending with 1860 averaged 5.09 per cent. The Master found that capitalizing these on a six per cent. basis would give a value of $84.83 per share. He concluded that a fair estimate was to take the average of the book value and this 'earning value' as indicated by the dividends, or 117.43 per share. This gave

for the total holding of the State a value of $323,167.36, which the Master allowed.

West Virginia excepts to the finding upon the ground that the book value of 150 per share should have been taken. This would make a difference in the total value of the stock of $89,632.64 or in the amount of West Virginia's credit of $21,063.68.

The exception is not well taken. It is urged that the book value represents actual value where books are correctly kept. This is not necessarily true, as books may be said to be correctly kept, in a sense, when they truly state the items set forth. But cost carried forward may not be the same as present value. Despite repairs and renewals, a suitable allowance for depreciation may not have been made. It would be too much to say that there is any controlling presumption and it clearly would not have been just to value the shares on a statement of book cost and surplus without taking into consideration the earning capacity. It is also complained that if the dividends for fifteen years (from 1850 to 1864) had been taken the average would have been higher; but this included dividends after 1861 paid in Confederate currency. It may be said that in this instance (as distinguished from others to which we shall presently refer) the Master arrived at his 'earning value' by taking the dividends declared instead of the actual net receipts, and that the latter exceeded the former. But the statement introduced gave the dividends; there was no separate computation of earnings, and these are not shown except as they may be computed from the trial balances which we have only for three years prior to March 30, 1861.

The Master sought to give proper weight to all considerations. His estimate upon this record could be only an approximation, but aside from any question as to the propriety of the precise method of calculation employed, there can be no doubt that the result has support in the

evidence and does full justice to West Virginia. The ex-
ceptions are overruled.

2. *Class C. Items 1 to 4, inclusive.* These are railroad
stocks and loans. In view of what has already been said,
the exceptions may be disposed of briefly. The exception
of Virginia and the bondholding creditors is substantially
the same as that taken with respect to the item in Class B,
and West Virginia insists that the full book value of the
securities should have been allowed.

*Item 1.*—17,490 shares (par value $50) of the stock of
the Orange & Alexandria Railroad Company. There was,
in addition, a loan of $398,670.60 to this company, for
which the Master allowed the face value.

There are no market quotations of this stock in 1860 or
1861. The company was incorporated about the year
1848. The book value was 50.27 in 1856, and 53.32 in
1860. This was deduced from the trial balance of 1856
and from the subsequent profits set forth by the reports
to the State. There was no showing of allowance for de-
preciation. Dividends had been paid on preferred stock
in 1857–9. It does not appear that any dividends were
declared in 1860 or 1861, although apparently dividends
to the amount of $31,604.09 had accrued prior to Jan-
uary 1, 1861, for which the State received dividend bonds;
the time of the declaration of these is not given. The
road was operated at a profit. Capitalizing the profits for
five years ending with 1860 at 6 per cent. the Master
found a value of 12.28, and taking the average of this
value and the book value (53.32), he estimated the shares
at 32.80, or at a total value of $573,672.

*Item 2.*—12,000 shares (par value $100) of the stock of
the Richmond & Danville Railroad Company. Loan of
$565,803.34 was allowed at face value.

There were published quotations of two sales, one in
November, 1860, at 60, and another in January, 1861, at
57. The report does not give the number of shares sold

or whether the sale was public or private. There is reference at various dates under 'Quoted' to 'Last sales,' but actual sales are not stated prior to 1863, except as mentioned above. The company was incorporated in 1847. The book value of the stock in 1860 (derived from the trial balance of 1856 and the later profits) was 137.37. The total stock was $1,981,197.50. Apparently, only one dividend had been declared,—in 1859, at four per cent. But the profits were large. For six years they had been about nine per cent., and in 1860 they rose to about eleven per cent. The average for five years ending with 1860 was $179,782.12, which capitalized on a six per cent. basis would give a stock value of $2,996,368.67. In view of this showing of profit the Master allowed the book value, with a deduction of five per cent. or 132.37 per share, making for the 12,000 shares held by the State an allowance of $1,588,440.

The exception of West Virginia in this instance merely relates to the deduction of five per cent. The Master treated the book value as virtually a 'liquidation value' and held that to arrive at a fair estimate of the actual value there should be some deduction for the expense of realization and this, upon the testimony of the expert for West Virginia, he fixed at five per cent.

*Item 3.*—3,856 shares (par value $100) of the Richmond & Petersburg Railroad Company. Dividend bonds amounting to $33,408 were allowed at face value.

There are no quotations under the head of 'Sales,' but simply references under 'Quoted' to 'Last sales' (from 64 to 57½), without particulars. The road had been incorporated in 1836 and its outstanding stock in 1860 amounted to $835,750. The book value at that time was 121.86. The dividends for four years had averaged nearly six per cent. The yearly profits averaged more, or $53,627.66, which capitalized gave a share value of 106.95. The Master took the average of the book value and so-

called earning value, allowing per share 114.40, or for the total of the State's stock, $441,126.40.

*Item 4.*—Stock of the Virginia Central Railroad Company. The State held on September 30, 1860, $1,891,670.68, in par value, of this stock, out of the then total stock of $3,152,854.23. By December 30, 1860, through additional payments on her subscription, the holdings of the State were increased to $1,927,382.57. There were also a loan of $90,032.82 and dividend bonds amounting to $143,508 for which face value was allowed.

There are quotations of two sales in November, 1860, at 50, but without details as to amount sold or character of sale. There are no other quotations of actual sales down to 1863, but simply references to 'Last sales,' as in the other cases above noted. The book value per share in 1860 was 131.16. Dividends were paid apparently to the amount of a little more than four per cent. in 1859, and nearly five per cent. in 1860. Profits for four years, ending with 1860, averaged $221,234.06 which capitalized at six per cent. gave a share value of 116.95. Taking the average of this and the book value, or 124.05, the Master allowed for the shares owned by the State, $2,390,918.08.

It must be concluded that with respect to these four securities (as in the case of the item in Class B) the quotations did not afford sufficient proof of market value to sustain the contentions of Virginia. On the other hand, in the absence of a more complete showing with respect to the physical property and its condition, the expenditures for maintenance and the extent of depreciation, it is wholly impossible to say that the book cost represented the actual value at the time to which the inquiry was addressed. Book cost, as we have said, would be a more or less doubtful criterion. After the lapse of so many years, an appraisal of this sort is obviously a matter of the greatest difficulty, and while the Master's valuation of these stocks may be regarded as a liberal one it is

probably as fair an estimate as could be made upon the facts presented.

3. *Class C.  Items 6, 8, 10, and 17.*  The exceptions in these instances are solely by West Virginia.

*Item 6.  Stock of the Alexandria, Loudon & Hampshire Railroad Company.*  It appeared that between the time of incorporation (1853) and January 1, 1861, Virginia had invested in this stock $993,248.  There were further investments making the total in April, 1862, $1,017,248.  All this stock was sold by Virginia on November 25, 1867, at five dollars a share, that is, for $50,862.40.  The proportion of this price applicable to the stock held on January 1, 1861, was $49,662.05.  This was the amount first stated as its value in West Virginia's exhibit of the values of items in Class C; but, subsequently, in the course of the proceedings the claim that the stock should be valued at par was advanced.  The Master estimated the value at $35,096.85, that is, taking the amount as of January 1, 1861, which would produce the above stated sum of $49,662.05 at the date of sale.

The evidence, as West Virginia concedes, is meager.  There are no market quotations.  It does not appear that any dividends had ever been paid or that any profits had ever been earned.  There is no statement of assets and liabilities, of traffic conditions, or of the results of operation.  There is little knowledge of the physical condition of the road.  West Virginia's contention is that the stock should be valued at par upon the ground that this is presumed to be the value and that Virginia had paid for it at that rate.

Statements may be found to the effect that par value is *prima facie* actual value (*Appeal of Harris,* 12 Atlantic Reporter, 743;  *Moffitt v. Hereford,* 132 Missouri, 513), but if such statements can be deemed to announce a comprehensive rule, to be applied in the absence of evidence as to the property and business

of the corporation, we cannot regard it as well founded. There is no such presumption of law and common experience negatives rather than raises such an inference of fact. We took this view in *Fogg* v. *Blair*, 139 U. S. 118, 127, when we criticized the supposition 'that the court, in the absence of averment or proof to the contrary, would assume that it (stock) was worth par, or had substantial value.' See also *Griggs* v. *Day*, 158 N. Y. 1, 23; *Warren* v. *Stikeman*, 84 App. Div. (N. Y.) 610; *Beaty* v. *Johnston*, 66 Arkansas, 529. Shares represent the proportionate interest of the shareholders in the corporate enterprise, and a rule that this interest in the absence of all supporting evidence should be taken as actually worth the par of the shares would be wholly artificial. There is no exigency in the administration of justice which requires or justifies such an extreme assumption.

In the present case, upon this record, it would be wholly improper to say that this stock was worth $993,248. Nor is there any evidence upon which we can ascribe value to it apart from the fact of the subsequent sale. West Virginia in claiming the credit had the burden of proving value, and it was not sustained save as value could be deduced from the amount of the proceeds. The exception must be overruled.

*Item 8. Loan to Virginia & Tennessee Railroad Company.*

In 1853 Virginia made loan to this company of $1,000,000, which was secured by mortgage. The loan was outstanding on January 1, 1861. In 1863, payments were made in Confederate money amounting to $886,685,—equal on a gold basis to $97,601.46. These payments the Board of Public Works of Virginia attempted to repudiate by its resolution of February 4, 1868, upon the ground that the Second Auditor of Virginia had no authority to receive them. That the moneys were returned is not clearly established. The Master finding no evidence of

the value of the loan aside from the fact that these payments had been made took their value (in gold), computed as of January 1, 1861, and allowed the sum of $84,799.90. West Virginia excepts upon the ground that the loan should have been taken at her valuation of $886,685.

The company was incorporated in 1836 under the name of the Lynchburg & Tennessee Railroad Company. In 1860 Virginia held stock of the par value of $2,270,525 and her holdings were subsequently increased to $2,300,000. It is urged that the book value of the shares on June 30, 1860, was 99.90, but we have no statement of assets and liabilities or of net earnings. The only year for which the result of operation is given (the one preceding June 30, 1860) showed a loss. It does not appear that any dividends were paid prior to 1864, and then Virginia received $138,000, which the Master figures as being equivalent in gold to one-half of one per cent.

In 1861 interest had accumulated upon the loan above mentioned to the amount of $280,000. Between 1861 and 1863 payments were made aggregating this amount in Confederate currency, the gold equivalent being $91,986.33. This accrued interest was made the subject of separate claim by West Virginia and was allowed in Class D at the value (in gold) of the payments, as of January 1, 1861, that is, $86,133.63. And to this finding there is no exception.

In 1870 Virginia transferred her stock in this road and whatever interest she had in the loan, together with her interest in other stocks and loans, to the Atlantic, Mississippi & Ohio Railroad Company for $4,000,000, secured by a second mortgage for that amount, subject to a first mortgage of not more than $15,000,000 which was to provide for existing liens, new construction and repairs and improvements. The payment of the $4,000,000 was to be in instalments of $500,000 each, the first of which was to

be made fifteen years later, in 1885. In addition to the stock and loan of the Virginia & Tennessee Railroad Company, there were embraced in this sale by Virginia 12,000 shares of the stock of the Norfolk & Petersburg Railroad Company, together with her claim for the unpaid balance ($163,000), and interest, of a loan of $300,000 to that company; 1,034 shares of the stock of the Virginia & Kentucky Railroad Company; and 8035 shares of the stock of the South Side Railroad Company with the claim of the State upon an outstanding loan by the latter of $800,000. This last-mentioned loan (to the South Side Railroad Company) constitutes Item 9 in Class C, and was found by the Master to be of no value; and to this ruling there is no exception. Both that loan and the one, now in question, to the Virginia & Tennessee Railroad Company, were included in the tabulation of the securities transferred but no value was assigned to them. The terms of the sale as the Master well says "are strongly indicative of an abortive, profitless enterprise." He adds that, "after the lapse of ten years, and the expenditure of approximately $5,000,000 of new money," it "again met with shipwreck, and the State was able to save as salvage from the wreckage, and that apparently through the grace of the first mortgagees, only the sum of $500,000 in 1882." In the absence of any satisfactory evidence of value with respect to the stocks thus transferred, the Master in connection with another item of claim to which we shall presently refer gave credit for this realization, discounted as of January 1, 1861, that is, for the sum of $204,688.42.

Upon this record, it certainly cannot be assumed that the loan to the Virginia & Tennessee Railroad Company was worth par, and in fact West Virginia has claimed on this item not par, but $886,685, the amount which was subsequently paid in Confederate currency. Apart from this payment, we find no basis whatever for an estimate of value as of January 1, 1861. The payment itself cannot

be taken for more than it was worth in gold and the Master in making his allowance on that basis went as far as the proof justified.

*Item 10. Loan to Norfolk & Petersburg Railroad Company.*

This is the loan which we have mentioned in connection with the sale in 1870 to the Atlantic, Mississippi & Ohio Railroad Company. At that time it appeared that the unpaid balance was $163,000. On January 1, 1861, the loan amounted to $300,000, and West Virginia contends that the face value should be allowed. The doubtful character of the claim is indicated by the fact that in one of West Virginia's exhibits the loan is scheduled with the statement under the head of 'Value,' January 1, 1861,—'No. claim—too indeterminate.'

As already stated, Virginia held 12,000 shares of the stock of this company; but we have no facts with respect to its condition, property, or operation, which would enable us to assign a value to the stock as of January 1, 1861. No net earnings are shown and for the year preceding March 31, 1861, it appears that the road was operated at a large loss.

On this showing we cannot say that the loan was worth its face. There is, in fact, nothing to support a valuation, save the moneys realized. The sum of $137,000 was paid in two instalments in 1867 and 1868, and the remainder of $163,000, with certain accrued interest, entered into the realization of 1882. The value of the total amount thus obtained, calculated as of January 1, 1861, or $108,415.45, was allowed. We find no ground for any larger credit.

*Item 17. Claim against the United States.*

Virginia made advances to the Government in aid of the War of 1812. These apparently were refunded but there remained a question as to interest. Virginia insisted that there was a balance of interest due on July 1, 1814, amounting to $298,369.74 which she claimed with

interest from that date. On the other hand, the United States held bonds of Virginia (which had been purchased by the Government as trustee for certain Indian tribes) amounting to $581,800, and also held $13,000 of bonds of the Chesapeake & Ohio Canal Company, guaranteed by Virginia. A settlement was effected under the Act of May 27, 1902 (c. 887, 32 Stat. 207, 235), by which February 11, 1894, was selected as the date of adjustment and the interest was calculated to that date on each side at six per cent. In the case of Virginia's bonds, the interest ran from January 1, 1861. The total claim of Virginia amounted to $1,723,582.53, and that of the Government (after certain credits of interest received and with the addition of $16,923.70 which had been paid to the Restored State of Virginia) amounted to a total of $1,723,577.03. The difference on this adjustment was only $5.50, which was paid to Virginia in cash.

West Virginia asked that there should be allowed, as an asset of the undivided State, the amount of this claim of Virginia against the Government to the extent of the principal with interest to January 1, 1861, that is, $1,130,821.31,—to the end that West Virginia should receive in the final adjustment of its liability a credit of 23½ per cent. of this amount.

The Master noted that the mutual claims of Virginia and the United States had been adjusted as of a selected date (long past) when with interest they practically balanced each other. He concluded that this convenient method of ending the controversy did not necessarily involve a determination of the cash values of the claims upon either side. He decided not to allow West Virginia's claim by virtue of this settlement so far as it involved interest. He found, however, that the bonds of Virginia ($581,800) which entered into the settlement were embraced in the indebtedness which was to be apportioned. The Master thought, therefore, that as their full face value

was included in the aggregate of the debt with respect to which West Virginia was to be charged, an appropriate credit on their account should be made. For this purpose, he took the face of the bonds with the cash item of $5.50, or $581,805.50 in all, as received in 1903, and calculated the value of that sum as of January 1, 1861. This amount, to wit, $164,584.30, he allowed.

West Virginia excepts, insisting that the sum allowed should have been $1,130,821.31.

The proper disposition of this item, it would seem, is to treat the common asset as applied to the redemption of a portion of the common debt. That is, the claim of Virginia against the United States was devoted to the payment of the bonds of Virginia amounting to $581,800, which formed a part of the debt to be divided. It is equitable that West Virginia being charged with her established share of the whole debt should be credited with the same share of the reduction thus accomplished. This will properly be effected by including the amount of the face value of these bonds in the total sum, on account of which as equitably applicable to the debt, West Virginia is to receive credit. We find no warrant for the diminution of this allowance through such a calculation as that made by the Master. Virginia's bonds, as has been said, constituted the principal of the Government's claim as it existed on January 1, 1861, and were discharged accordingly. What remained of Virginia's claim against the Government—that is, of the common asset—was exhausted in the payment of the interest subsequently accruing upon the common debt, and if any equity exists with respect thereto, it is one to be adjusted in the disposition of the question of interest.

It follows that upon the item now under consideration there should have been allowed the sum of $581,800 instead of $164,584.30, making a difference of $417,215.70.

4. *Class C. Item 19. Dividend bond, $149,984, of the*

*Richmond, Fredericksburg & Potomac Railroad Company.*
The Master allowed this item at the face value.

The exception is taken by Virginia and the bondholding creditors upon the ground that the bond was paid in 1863 in Confederate money.

This, however, is not a case where there is resort to the subsequent realization as evidence of value. On the contrary, the railroad company, as the Master found, was operating at a profit. Its stock (Class B, *supra*), was valued at 117.43. The bond, upon the evidence, was a good asset at its face on January 1, 1861, and was properly valued as such in the same manner as the loans included in Class C, Items 1 to 4.

5. *Class E. Items 1 to 4, inclusive: Bank stocks.*

The shares embraced in these items and the values fixed by the Master are as follows:

Farmers' Bank of Virginia, 9,626 shares at
  102.89,. . . . . . . . . . . . . . . . . . . . . . . . . . .   $990,419.14
Bank of Virginia, 13,766 shares at 71.49,     984,131.34
Bank of the Valley, 4,839 shares at 102.6,.   496,481.40
Exchange Bank, 8,755 shares at 102.2,. . .   894,761.00

In each case the Master took the book value with a deduction of five per cent. The sole exception is by West Virginia, who contends that the full book value should have been allowed.

It is urged that Virginia continued to own the shares and that no process of liquidation was necessary. But the deduction did not proceed upon the view that an actual liquidation was required. The Master's conclusion was based upon the unassailable ground that the book value only represented the amount which, according to the books, could be obtained from the assets upon a liquidation; that hence the book value did not represent the actual net value of the shares; and that this actual value could not be estimated without a proper allowance for the expense of realization. He made this allowance upon a

basis sustained by the evidence, and there is no reason for disturbing his finding.

6. *Class F.   Securities sold to the Atlantic, Mississippi & Ohio Railroad Company.*

These embraced the stocks to which reference has been made in the discussion of Items 8 and 10 of Class C, *supra.* The Master, as stated, allowed for these—$204,688.42. West Virginia excepts because the Master did not allow either the book value of $4,276,044.39 or the sum of $4,000,000 for which the second mortgage, already mentioned, was given at the time of the sale in 1870. We have commented upon the lack of evidence with respect to the value of the shares of the Virginia & Tennessee Railroad Company and the Norfolk & Petersburg Railroad Company, two of the four companies in question; and also upon the fact that in the case of the third company, the South Side Railroad Company, a loan of $800,000 outstanding on January 1, 1861, was found by the Master to be of no value and no exception has been taken to the finding. With respect to both the company last mentioned and the remaining company, the Virginia & Kentucky Railroad Company, as well as in the case of the two others, the record discloses no facts with respect to condition, assets and liabilities, and results of operation, which can be deemed to furnish any adequate ground for a conclusion as to actual worth. The schedule of 1870, at the time of the transfer of these stocks to the Atlantic, Mississippi & Ohio Railroad Company simply gives par values and, as has been said, the purchaser of these stocks, and other items, executed therefor a second mortgage for $4,000,000 payable in annual instalments of $500,000 each, the first payment being postponed until 1885. We find in this transaction no proper basis for a valuation as of 1861. Notwithstanding the expenditure of large amounts upon the properties, the second mortgage proved to be worthless except for the sum of $500,000 paid in 1882

on the foreclosure of the first mortgage, and this payment
it would seem was not based upon the actual value of the
property but was rather in the nature of a concession to
assure a complete title without controversy.  There is no
warrant in the evidence for any greater allowance than
that which the Master gave.

7. *Class G.  Stock of the James River & Kanawha Com-
pany.*

The State held $10,400,000, in par value, of this stock,
or 91.77 per cent. of the entire capital stock, at a total
cost of $9,547,582.21.  The Master allowed as its value
$1,664,333.  The exception is by Virginia, and the bond-
holding creditors, it being insisted that the stock had no
value.

The record contains voluminous reports, statistics and
testimony, with respect to this historic enterprise, showing
the facts as to its development, the property which the
company owned, and the course of its business.  It would
be almost impossible briefly to review these facts, and
their recital at length would serve no useful purpose.  The
capital, as has been said, was mainly supplied by the State
and by January 1, 1861, there had been completed ap-
proximately one hundred and ninety-five miles of the
canal, from Richmond to Buchanan, with a branch of
twenty-two miles to Lexington.  There had been no divi-
dends, save one of $10,092 in 1836.  In addition to the
original investment in the stock, there had been an in-
creasing indebtedness to the State which amounted in the
year 1860 to $7,560,214.44.  As the company was unable
to earn sufficient to pay the interest upon this indebted-
ness, the State under the Act of March 23, 1860, provided
for an increase of capital stock and took in satisfaction of
its debt (and to make specified provision for floating debt)
74,000 shares in six per cent. preferred stock.  Upon the
assumption that this exchange had been effected and that
the debt of the State had been converted into capital,

eliminating the interest charge, it appeared that the net operating revenue in 1860 amounted to $151,000.14. If computed on the same basis, it appeared that the average annual net operating revenue for seven years, including 1860, would have been $115,554.21, and for twenty-five years, $111,800. It seems, however, that there were certain outstanding bonds amounting to $199,000 upon which the company was liable, and that to get the net earnings, exclusive of any return to the State, it would be necessary to deduct the annual interest upon this sum, that is, $11,940. The Master concluded that upon the evidence the only basis for computation of value was to take the average net returns for twenty-five years ($111,800), deducting this interest ($11,940), or $99,860. Capitalizing these earnings at six per cent. the value of the property was fixed at the sum above stated, to wit, $1,664,333. The Master thought that this estimate was a liberal one in view of the fact that the computation did not make allowance for depreciation, and of the diminished returns of the succeeding years. But the basis chosen seemed to be the only one upon which he could reach a reasonable conclusion. In view of the property shown to have been owned by the company, and the evidence as to the results of operation, we think that the exception of Virginia and the bondholding creditors cannot be sustained and that the Master's appraisal should be accepted.

That West Virginia, after this painstaking investigation, was not dissatisfied with the result is apparently shown by the fact that in filing its exceptions to the Master's report, it took no exception to his finding as to this item. In its brief, however, in discussing Virginia's exception, West Virginia states that it 'now excepts' to the Master's finding because of his failure to allow $2,516,666 instead of $1,664,333. While this might not be regarded as a formal exception which should receive consideration, we should

not be disposed to ignore it if it had merit, but should
consider the objection in the same untechnical spirit in
which the controversy has been dealt with from the be-
ginning. But we do not think that the exception is well
taken. The suggested value is reached by capitalizing
the net operating revenue of a single year, that is, by
taking the return for 1860 at the amount above stated,
$151,000.14, which on a six per cent. basis would give a
value of $2,516,666. This, however, makes no allowance
for the interest charge of $11,940; and, further, we think
it would be wholly unjustifiable in the light of the history
of this company to capitalize upon the return of one year.
It is objected, however, that the Master reached his result
by taking the average net returns for a period of twenty-
five years which included the early years of the under-
taking, but if we take the net returns of seven years
preceding September 30, 1860, as shown by the exhibit
prepared by West Virginia's accountant, or $115,554.21,
and deduct the interest charge of $11,940, there remains
$103,614.21 as the annual net profit, exclusive of any re-
turn to the State. This sum capitalized at six per cent.
would show a value of $1,726,903, a sum very slightly in
excess of the Master's estimate. Having regard to the
absence of allowance for depreciation, it cannot be said
that West Virginia is entitled to have the estimate in-
creased.

8. *Class G. Stock of the Manassas Gap Railroad Com-
pany.*

Virginia owned $2,105,000 of this stock in par value, out
of a total of $3,322,164.67. The Master found no evidence
upon which he could assign a value to this stock, and West
Virginia excepts insisting that it should have been es-
timated to be worth par.

In the supplemental answer, a value was placed upon
the stock at 25 per cent. of the par value in view of the
lapse of time and the lack of clear evidence as to actual

value. Even this, however, cannot be regarded as more than a conjecture. It was shown before the Master that the road had been operated as far as Mt. Jackson and was in course of construction to Harrisonburg, but no satisfactory data were furnished as to the condition of property, liabilities, earnings, etc., upon which any finding of value could properly be made. It is, therefore, suggested that in the absence of proof to the contrary the stock should be presumed to be worth par, but, as already stated, no such assumption is justified. There was a failure of proof as to this item and the Master properly disallowed it.

9. Under her general exception, West Virginia raises two further objections which affect the credits to be allowed.

(1) It appeared that certain counties in West Virginia, after the organization of the State, paid taxes, fines, etc., to Virginia amounting to $180,264.45. Credit for this was asked by West Virginia, but was refused by the Master. He found that the circumstances under which this amount was assessed were 'involved in a great deal of doubt and uncertainty.' It appeared that a balance could not fairly be struck with respect to the sums thus paid without taking into consideration the expenses of the actual government of the counties in question for the maintenance of which it was raised. As the Master says: "The amount" (of these expenses) "however was not known. It may have been more, it may have been less than the amount paid in taxes." The record does not furnish any ground for the allowance of this item.

(2) The Master concluded that if West Virginia were credited with her proportionate share of the assets which have been valued, she should be charged with the moneys and securities which she received from the Restored Government of Virginia, to wit, $170,771.46 in money, and $370,696.30 in securities, making a total of $541,467.76. West Virginia makes no objection to the charge of the

securities but excepts to the ruling as to the money. There seems to be no doubt that the money was in fact received from the Restored Government of Virginia, and that it was money belonging to Virginia which was turned over to the new State. It would seem to be clearly equitable that, if the credits in question are allowed, this charge should be made.

10. The further exception is taken by the bondholding creditors (not by Virginia) to the failure of the Master to hold that Virginia was entitled to apply the assets, thus valued, to various obligations not embraced in the principal debt which, as heretofore determined, is to be apportioned. The contention thus urged is but a repetition in another form of the arguments which have already been considered in reaching the conclusion that these assets should be regarded as specifically dedicated to the discharge of the indebtedness to be apportioned, and that West Virginia in assuming an equitable proportion of that indebtedness was entitled to a credit accordingly. The exception cannot be sustained.

All the exceptions relating to the credits in question have now been considered. The values as thus ascertained are:

| | | |
|---|---|---|
| Class A | $ | 819,250.03 |
| Class B | | 323,167.36 |
| Class C | | |
| Allowed by Master | $7,352,594.65 | |
| Increase in Item 17 | 417,215.70 | 7,769,810.35 |
| Class D | | 345,554.80 |
| Class E | | 3,802,357.48 |
| Class F | | 204,688.42 |
| Class G | | 1,664,333.00 |
| | TOTAL | $14,929,161.44 |

Credit to West Virginia of 23½ per cent.
  of $14,929,161.44.................$ 3,508,352.94
Less money and securities received by
  West Virginia from Restored Govern-
  ment of Virginia as found by Master.      541,467.76
                                        ─────────────
        Net credit to West Virginia.....$ 2,966,885.18
                                        ═════════════

This would give as West Virginia's equitable proportion of the principal debt the sum of $4,215,622.28, as follows: 23½ per cent. of principal debt ($30,563,861.56)
  to be apportioned................$ 7,182,507.46
Deduct credit to West Virginia, as above   2,966,885.18
                                        ─────────────
West Virginia's share of principal debt.$ 4,215,622.28
                                        ═════════════

*Interest.* There remains the question of West Virginia's liability for interest.

This liability is contested upon the grounds that the claim of Virginia has been unliquidated and indefinite, that interest is not recoverable as damages save on default in the payment of an amount which is certain or susceptible of ascertainment, that there was no promise on the part of West Virginia to pay interest, that unearned interest was not a part of the debt of which she agreed to assume an equitable proportion, and that in the absence of an express promise interest is not to be charged against a sovereign State.

All the questions thus raised may be resolved by the determination of the fair intendment of the contract itself. If liability for interest is within the scope of the agreement no objection can lie on the ground of uncertainty in amount, as the promise attaches to the amount found to be payable. In this view, also, no question would be involved as to an award of interest by way of damages as distinguished from a recovery by virtue of the terms of the

undertaking. Nor can it be deemed in derogation of the sovereignty of the State that she should be charged with interest if her agreement properly construed so provides. The fundamental question is, What does the contract mean?

This subject has been discussed elaborately—from every possible point of view—in the comprehensive arguments which have been presented, but the considerations which must be deemed to be controlling are clearly defined and may be succinctly stated.

The subject-matter of the contract was a 'public debt.' That debt consisted of outstanding bonds. Some of these were redeemable at pleasure; but for the most part they were unmatured and had many years to run. These bonds provided for the payment of interest as well as principal; they were interest-bearing obligations. It is true that on January 1, 1861, there was interest due and unpaid, and apparently there were also some matured bonds; but these amounted to but a small fraction of the 'public debt.' The debt to which the parties referred,—as it existed prior to and on January 1, 1861,—was not a debt in the sense of a specific sum then due and payable, but manifestly was the liability evidenced by the outstanding obligations of which the promised interest was an integral part.

This being the subject-matter of the agreement, its express words have a clear significance. It was provided that West Virginia should 'assume' her equitable proportion of the public debt. This was not an undertaking simply to pay a percentage of principal. West Virginia was to take upon herself a just share of the public burden represented by the bonds, and we cannot regard this provision as subject to an unexpressed limitation that interest should be excluded. A contract to assume an interest-bearing debt means the taking over of the liability for interest as well as principal. And the same is true *pro*

*tanto* of the assumption of an 'equitable proportion' of the debt. Both parties unquestionably contemplated that interest would accrue upon these bonds. They were making provision for payment and not looking to default. Certainly, Virginia was not expected to bear the burden of the interest accruing on the share to be taken by West Virginia. The very purpose of the contract was to secure—as between these parties—Virginia's exoneration with respect to that share. As it was plainly not the intention either that the bondholders should go without interest as to the proportion assumed by West Virginia, or that there should be left with Virginia the entire burden of meeting the interest on the outstanding bonds while the principal was apportioned, it must follow that the assumption of an equitable share by West Virginia related to the liability for both principal and interest. We cannot read the contract otherwise.

Nor do we think that in the construction of the provision of the constitution of West Virginia (Art. VIII, § 8), which defines her engagement, the second clause can be ignored. After stating that an 'equitable proportion' of the public debt shall be assumed by West Virginia, it is provided that 'the legislature shall ascertain the same as soon as may be practicable, and provide for the liquidation thereof, by a sinking fund sufficient to pay the accruing interest, and redeem the principal within thirty-four years.' If there could otherwise be any doubt as to what was embraced in the contract of assumption, this provision would dissipate it. It is true, as we have said, that this direction to the legislature did not undo the contract by making 'the representative and mouthpiece of one of the parties the sole tribunal for its enforcement.' But it throws a clear light upon what the parties had in mind. The 'accruing interest' had not escaped their attention. And it was because the payment of accruing interest was an essential part of the obligation to be as-

sumed in the division of the 'public debt,' that the legislature was enjoined to establish an adequate fund by which the assumed liability in its full scope would be discharged.

The lapse of time has not changed the substance of the agreement. It is not necessary to review the history of the intervening years or to pass upon the contentions of the parties with respect to responsibility for delay. The contract is still to be interpreted according to its true intent, although altered conditions may have varied the form of fulfilment. It is urged that there are equities to be considered, but we can find none which go so far as to destroy the claim. On the contrary, there is no escape from the conclusion that there was a contract duty on the part of West Virginia to provide for accruing interest as a part of the equitable proportion assumed, and that it would be highly inequitable as between the two States that Virginia as to her share should bear interest charges for these fifty years while West Virginia on her part should simply pay a percentage of principal reduced by the credits which have been allowed.

While liability for interest exists, there is still the question as to the rate at which interest should be allowed. Virginia, it appears, has not paid upon her estimated share the rate which was reserved in the bonds. This fact, we think, raises an equity demanding recognition. In fixing West Virginia's share of the principal, we took into account the fact that Virginia, by the consent of the creditors, had reduced her own share below the amount which it would have been upon the basis we found to be correct, and we gave appropriate credit to West Virginia on account of this difference. 220 U. S., p. 35. And it would not be proper to hold West Virginia to the rate of interest specified in the bonds when Virginia as to her share has made arrangement with the creditors for a lower rate. The provision that the share of West Virginia shall be an equitable proportion is the dominating principle of the

award, and while Virginia as we have held is entitled to enforce the contract, in the due performance of which her honor and credit are concerned, her action with respect to her own estimated share must be taken into consideration.

In 1866, the General Assembly of Virginia provided for the funding of unpaid interest, on bonds issued prior to April 17, 1861, in bonds bearing the same rate of interest. It appears in the evidence that the bonds issued under this act for unpaid interest amounted to $6,576,913.60. It is also stated on behalf of Virginia that there was paid in cash from January 1, 1861, to December 31, 1871, on account of interest, the aggregate sum of $7,094,103.61, making a total of $13,671,017.21. Of these cash payments, $4,519,065.04 were paid in Confederate currency between January 1, 1861, and April 1, 1865, the equivalent of which in gold is stated to be $2,261,358.91, making the total money payments for interest during this period on a gold basis equal to $4,836,397.48.

By the Act of March 30, 1871, Virginia, assuming that the equitable share of West Virginia was about one-third, made provision for the issue of new bonds which, as the bill in the present case sets forth, were to be "for two-thirds of the principal, and for two-thirds of the past due interest, and also for two-thirds of the interest on that accrued interest," which accrued interest to the extent above mentioned had been funded in bonds issued after the War. The new bonds were to bear interest at the same rate as the old bonds,—for the most part, six per cent. For the remaining one-third, there was to be issued upon the surrender of the old bond, a certificate of even date with the new bond setting forth the amount which was not funded, that payment with interest would be provided for in accordance with such settlement as should be made between Virginia and West Virginia, and that the old bonds so far as unfunded were held 'in trust for the holder or his assignees.' Under this act as was said

in *Hartman* v. *Greenhow,* 102 U. S. 672, 679, "a large number of the creditors of the State, holding bonds amounting, including interest thereon, to about thirty millions of dollars, surrendered them and took new bonds with interest coupons annexed for two-thirds of their amount and certificates for the balance." It should be added that it appears that there were certain bonds aggregating $864,842.03 in principal, which were held by educational institutions in Virginia, for which Virginia issued new bonds in full without deducting one-third for West Virginia's share. It is testified that upon these last-mentioned bonds six per cent. interest has been paid continuously.

As it appeared that even under the measure of 1871 Virginia had assumed a heavier burden than she felt able to bear, other plans were attempted for the settlement of the state debt. By the Act of March 28, 1879, the effort was made to accomplish a refunding upon the basis of fifty per cent. of accrued interest and one hundred per cent. of principal (of Virginia's estimated share) in new bonds payable in forty years (and redeemable after ten years) with interest at three per cent. for ten years, four per cent. for twenty years, and five per cent. for ten years. Under this statute, the two-thirds' basis was maintained and those making the exchange, in cases where certificates for the remaining one-third had not already been issued, were to receive certificates like those authorized by the Act of 1871.

While there was a refunding to some extent upon this basis, the legislation of 1879 very largely failed to accomplish its purpose, and another attempt was made under the Act of February 14, 1882. By this, the outstanding bonds were divided into classes. For those which had been issued under the Act of 1871, new bonds were authorized on the basis of fifty-three per cent. of principal and one hundred per cent. of accrued interest. The act recited that the net revenues of the State did not warrant

the assumption of a larger rate of interest than three per cent. upon the full amount of Virginia's equitable share of the old debt as the same was ascertained and formally declared by an account set forth in the preamble,—an account stated on the two-thirds' basis. The new bonds were for fifty years (redeemable after July 1, 1900) with interest at three per cent. until paid.

As shown by the account contained in this act, the payments in money from January 1, 1861, to July 1, 1871, for interest, amounted to $7,256,723.66.[1] In this account, the entire amount thus paid was credited against the two-thirds of the accrued interest (or interest on two-thirds of the principal) which Virginia had estimated to be her equitable share. The interest on this share exceeded these payments. It also appeared that between 1863 and 1871 bonds had been redeemed to the amount of $3,710,449.67 and this amount was credited against Virginia's two-thirds of principal. The statement of account was made for the purpose of explaining and justifying the attempted readjustment.

The plan of 1882 proved abortive. New bonds to a considerable amount were issued under its provisions, but the bondholders for the most part refused to accede to its terms and apparently there were outstanding on February 20, 1892 (unfunded under the Act of 1882) about $28,000,000 of principal and interest (to July 1, 1891), that is, as representing Virginia's assumed proportion. On that date an act was passed by the General Assembly which provided for the refunding of these bonds on the basis of nineteen-twenty-eighths of the principal and accrued interest (as of July 1, 1891) in new bonds bearing two per cent. interest for ten years and three per cent. until paid. The bonds were to be for one hundred years, and were redeemable after July 1, 1906. The refunding was carefully limited

---

[1] Of this total, the sum of $3,662,434.55 is stated as having been paid from January 1, 1861, to July 1, 1863, and the amount paid from July 1, 1863, to July 1, 1871, is given as $3,594,289.11.

to the two-thirds' basis and certificates were to be issued for the remaining one-third similar to those above described. In 1894 provision was made for further time for an exchange on the stated basis, which however was not to be extended beyond the end of the year. There were additional bonds, said to amount to over $2,400,000, held by educational corporations, which were refunded under a statute passed February 23, 1892, in new obligations for their full amount of principal and interest.

. Under this legislation the refunding was accomplished. Virginia alleges in her bill that "at length a final and satisfactory settlement of the portion of the debt of the original State which Virginia should assume and pay was definitely concluded by the Act of February 20, 1892."

In the light of this financial history, we come to the consideration of Virginia's payments. It is stated on behalf of Virginia that the amount of interest paid by her from January 1, 1861, to September 30, 1913 (the latest date to which the calculation has been made), amounted to $41,071,219.02. Taking Virginia's share of principal at the amount assumed by her, as computed in our former decision (220 U. S., p. 35), that is, $22,598,049.21 (an amount somewhat less than her true proportion of the total debt of January 1, 1861), the total interest paid as above stated, would be the equivalent of simple interest upon that principal at a rate somewhat less than three and one-half per cent.

But these payments on account of interest did not include bonds that had been retired, and Virginia's exhibit shows that in addition to these payments she had 'paid off and retired' (down to September 30, 1913) bonds amounting to $12,141,591.49; and that, further, her new bonds issued for the portion of the old debt, funded and assumed by her, and outstanding on September 30, 1913, amounted to $24,645,075.23. These items including the item of interest first mentioned make a total of

$77,857,885.74. We have in this aggregate the amounts paid by Virginia on account of the old debt to the date mentioned. If from this total we deduct the amount of Virginia's assumed share of principal, as above computed ($22,598,049.21), the remainder would be $55,259,836.53; or, if all payments of interest were put on a gold basis, $53,002,130.40. If we treat this entire sum as applicable to interest—and to interest upon Virginia's assumed share alone—it would be the equivalent of simple interest upon the principal stated, from January 1, 1861, to September 30, 1913, at a rate a little less than four and one-half per cent.

It is manifestly impracticable, and it would not be equitable, to apply rates of interest in the present determination which would follow the details of Virginia's financial arrangements. The amounts included in the total of Virginia's payments represent large sums paid as interest upon interest. West Virginia's equitable proportion should not be increased by a rate based upon successive allowances of compound interest.

But in the light of the facts that have been recited a fair basis of adjustment may be fixed.

It will be observed that the amount of the new bonds shown by Virginia's statement to be outstanding on September 30, 1913, was slightly in excess of her assumed share of principal as computed. That is, Virginia through the successful operation of the Act of 1892 (which provided for a refunding as of July 1, 1891), taken with what had been effected under the Act of 1892, placed an amount substantially equal to her assumed share of principal upon a permanent basis of three per cent. There appears to be an exception to this in the case of certain securities, but their amount is relatively small. Virginia's creditors may have been induced to accept this adjustment, and the low rate it involved, by reason of the inclusion of unpaid interest in fixing the principal of the new bonds. But, on the other hand, the total of the principal and in-

terest then outstanding was largely reduced in the refund-
ing, and the rate of interest upon the new bonds under the
Act of 1892 for the first ten years was made two per cent.
The reduction, and the ten years' rate, may well be regarded
as offsetting the advantage derived from including in the
face of the new obligations whatever excess there may have
been over the assumed share of Virginia as computed.

Taking all the facts into consideration, we reach the
conclusion that in fixing the equitable proportion of West
Virginia, her part of the principal should be put on a three
per cent. basis, as of July 1, 1891; that is, that interest
should run at that rate from that time.  For the preceding
period, from January 1, 1861, to July 1, 1891, there is
greater difficulty.  In recognition of the amounts paid by
Virginia upon her share, but also having in mind the pay-
ments of compound interest attributable to her own
exigency, the nearest approach to complete justice will
be had by allowing interest at four per cent.

This, we are satisfied, will adequately recognize and
enforce the equities of both States.

Upon this basis, West Virginia's share of the debt will be:
    Principal, after allowing credits as stated, $4,215,622.28
    Interest,
    January 1, 1861, to July 1,
      1891, at four per cent. . $5,143,059.18
    July  1,  1891,  to  July  1,
      1915, at three per cent. .  3,035,248.04   8,178,307.22
                                             ————————————
                                              $12,393,929.50
                                             ════════════

For convenience the calculation of interest has been
made to July 1, 1915.  In the decree the calculation will
be at three per cent. per annum from July 1, 1891, to the
date of entry.  The decree will also provide for interest
at the rate of five per cent. per annum upon the amount
awarded, until paid.

Costs to be equally divided between the States.