MURATTI, PETITIONER, *v.* FOOTE, RESPONDENT, (PEOPLE, INTERVENOR).

PETITION for a Writ of Certiorari to the Judge of the District Court of Mayagüez in a Prosecution for Murder in the Second Degree.

No. 185.—Decided July 13, 1917.

MURDER—CERTIORARI—CITIZENSHIP OF THE UNITED STATES—EXTENSION OF CITIZENSHIP TO PORTO RICO.—Historically and legally the whole citizenship of the United States forms the people of the United States, and to be a citizen is to be a part of the sovereign power. The sovereignty of the United States, in the objective sense, was extended to Porto Rico by the Treaty of Paris, and, in the subjective sense, or as the fundamental ruling power, by the Jones Act.

ID.—ID.—ID.—TREATY—ACT OF CONGRESS.—There is no radical difference between the effect of a treaty of the United States and an act of Congress, although sometimes a treaty may require congressional action; but if there were any difference, the act of Congress, where both Houses intervene, should be preferred; hence it follows that any interior regulation which may be effected by treaty may be effected also by an act of Congress. The effect of a grant of citizenship made by an act of Congress is equal, if not superior, to a grant made by treaty.

ID.—ID.—ID.—RENUNCIATION OF CITIZENSHIP.—There are no grades of citizenship in the United States; therefore it cannot be said that the collective citizenship granted to the people of Porto Rico by the Jones Act is restricted by reason of the proviso permitting its renunciation within six months from the approval of the act.

ID. — ID. — ID. — ORGANIZED TERRITORY — INCORPORATED TERRITORY — CONSTITUTION.—Given the history of the United States and the history of Porto Rico, the grant of collective citizenship to the inhabitants of Porto Rico by section 5 of the Jones Act has converted this organized territory under the Foraker Act into an incorporated territory; therefore the Constitution is now in full force and effect and with it the Fifth Amendment, which provides for indictment by grand jury in case of capital or otherwise infamous crime.

ID.—ID.—ID.—ID.—ID.—The elements which necessarily complete the incorporation of a territory are the acquisition of the territory, the citizenship of its inhabitants and organized government, and even in some cases in which the first two exist, as in the case of Alaska, nothing more is required than some action on the part of Congress.

ID.—ID.—ID.—ID.—ID.—No specific formula is necessary in order to incorporate a territory, but, if necessary, in the case of Porto Rico, it is given in the Jones Act which states positively that "all citizens of Porto Rico * * * are hereby declared, and shall be deemed and held to be, citizens of the United States." The association of the inhabitants of Porto Rico with the people of the United States is made complete, and the people of the continent of the United States and the people of Porto Rico are citizens of a common country.

The facts are stated in the opinion.

Messrs. Feliú & Alemañy for the petitioner.

Messrs. Howard L. Kern, Attorney General, Salvador Mestre, Fiscal of the Supreme Court, and George S. Brengle, for the intervenor.

MR. JUSTICE WOLF delivered the opinion of the court.

The petitioner was charged with murder in the second degree. On the day of the arraignment in the District Court of Mayagüez he presented a motion asking that court to annul or set aside the information because it was filed without the presentment of a grand jury, thus violating the Fifth Amendment to the Constitution of the United States. The Fifth Amendment is as follows:

"No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offence to be twice put in

jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation.''

The real question before the court is whether the Constitution of the United States is to-day in full force and vigor in Porto Rico, and especially the said Fifth Amendment.

Counsel for the petitioner, as we understood him, placed his principal reliance upon the theory that Porto Rico was incorporated independently of the Act of Congress of March 2, 1917, familiarly known as the Jones Act, but as to the status of Porto Rico prior to that act we are concluded by the decision of the Supreme Court in the cases of *Downes* v. *Bidwell,* 182 U. S. 244; *Dorr* v. *United States,* 195 U. S. 138; *Rasmussen* v. *United States,* 197 U. S. 516. These decisions hold in effect that the whole Constitution does not apply to acquired territory until Congress incorporates it. A specific pronouncement that Porto Rico was not incorporated territory under the Foraker Act is found in *Kopel* v. *Bingham,* 211 U. S. 468, 476, as follows:

''It may be justly asserted that Porto Rico is a completely organized Territory, although not a Territory incorporated into the United States, and that there is no reason why Porto Rico should not be held to be such a Territory as is comprised in par. 5278.''

And this view was confirmed in the cases of *American Rail road Company* v. *Didricksen,* 227 U. S. 145, and *People of Porto Rico* v. *Rosaly,* 227 U. S. 270, 274. Previous to March 2, 1917, this court had a similar understanding of the law *Ex parte Bird,* 5 P. R. R. (1st ed.) 507; *Ex parte Díaz,* 7 P. R. R. 153; *People* v. *Oliver,* 7 P. R. R. 301; *People* v. *Rivera,* 7 P. R. R. 325; *People* v. *Kent,* 10 P. R. R. 325; *People* v. *Acosta,* 11 P. R. R. 240; *Cintrón* v. *Banco Territorial y Agrícola,* 15 P. R. R. 495. The situation, however, has been varied by the Jones Act.

Section 5 of the Jones Act provides as follows:

"That all citizens of Porto Rico, as defined by section seven of the Act of April twelfth, nineteen hundred, 'temporarily to provide revenues and a civil government for Porto Rico, and for other purposes,' and all natives of Porto Rico who were temporarily absent from that island on April eleventh, eighteen hundred and ninety-nine, and have since returned and are permanently residing in that island, and are not citizens of any foreign country, are hereby declared, and shall be deemed and held to be, citizens of the United States; *Provided,* That any person hereinbefore described may retain his present political status by making a declaration, under oath, of his decision to do so within six months of the taking effect of this Act before the district court in the district in which he resides, the declaration to be in form as follows: * * *."

The contention is that the citizenship so conferred on the inhabitants of Porto Rico, given the history of the United States and the history of the island, has made this organized territory an incorporated one.

The Government of Porto Rico, through its Attorney General, has maintained that the question of incorporation for Porto Rico is dependant solely on the will of Congress and that the Jones Act not only evinces no intention to incorporate, but expresses a contrary intent, and that subsequent contemporaneous acts of Congress point in the same direction. He further maintains that the writ in this case should be annulled because the legislature of Porto Rico, created by the Act of March 2d, has had no opportunity to establish a grand jury.

In pursuance of the theory that the intention of Congress to incorporate has not been expressed, the Attorney General has presented a very careful analysis of the Jones Act, existing acts of Congress and of the state of law supposed to be declared by the Insular decisions and the Rasmussen case. Indeed, were it not for the grant of citizenship in the Jones Act the contention of the Attorney General under the authorities would have to prevail. But collective citizenship was granted to the inhabitants of Porto Rico by the Jones Act.

*McCulloch* v. *Maryland,* 4 Wheaton, 402, declared the people of the United States sovereign and that the Constitution and all powers emanated from them and that the Constitution was created, as stated by them in the preamble, to form a more perfect union. In *Osborn* v. *Bank of the United States,* 9 Wheat. 737, the court again, through Mr. Justice Marshall, held that a naturalized citizen becomes a member of the society, possessing all the rights of a native citizen and standing in the view of the Constitution on the footing of a native, a principle that was reiterated in the case of *United States* v. *Wong Kim Ark,* 169 U. S. 703. The words "people of the United States" and "citizens" are synonymous terms and mean the same thing. *Scott* v. *Sandford,* 19 Howard, 404; *United States* v. *Cruikshank et al.,* 92 U. S. 549; *Boyd* v. *Thayer,* 143 U. S. 159. In *Hennessey* v. *Richardson Drug Co.,* 189 U. S. 25, the court quoted with approval a North Carolina case, *State* v. *Manuel,* 4 Dev. & Bat. 20, 24, 26, which said: "The term 'citizen,' as understood in our law, is precisely analogous to the term 'subject' in the common law, and the change of phraseology has resulted entirely from the change of government. The sovereignty has been transferred from one man to the collective body of the people; and he who before was a subject of the King is now a citizen of the State."

Historically and legally, as shown by the cited cases, the idea is that the whole citizenship of the United States forms the people of the United States and that to be a citizen is to be a part of the sovereign power. The sovereignty of the United States in the objective sense was extended to Porto Rico by the Treaty of Paris. We hold that in the subjective sense, or as the fundamental ruling power, the sovereignty of the United States has been extended to Porto Rico by the Jones Act.

It is maintained that *Downes* v. *Bidwell,* 182 U. S. 244, and *United States* v. *Rasmussen,* 197 U. S. 516, are authorities for the position that Porto Rico is not incorporated ter-

ritory, the grant of collective citizenship in the Jones Act to the contrary notwithstanding. We have examined these decisions with scrupulous care and we find nothing therein to support the Government's theory. On the contrary we think that the inevitable trend and bearing of these decisions is necessarily in favor of Porto Rico being now an integral part of the United States, like Louisiana, Florida and other territories, before their admission as States, and like Hawaii, the District of Columbia and Alaska today. Before entering into a consideration of these cases involving citizenship there is one other thing to be premised.

Is there any radical difference between the effect of a treaty of the United States and an act of Congress? The Supreme Court of the United States in *De Lima* v. *Bidwell,* 182 U. S. 1, has answered the question in the negative. In the opinion of the court on page 195 the cases are gathered together which hold that a treaty is as much to be regarded by the court as an act of Congress; that it is the equivalent of an act of the Legislature. The dissenting opinion on page 215 specifically grants this, and, of course, as the opinion, page 195, shows, the equality or equivalence follows from the Constitution. Whether a treaty may sometimes require further congressional action is aside from our present argument. As if anything the act of Congress, where both houses intervene, is to be preferred, it follows necessarily that any interior regulation that may be effected by treaty may surely be effected by an act of Congress.

Let us consider the case of *Downes* v. *Bidwell.* The dissenting judges therein, 182 U. S. 347 *et seq.* (excepting perhaps Mr. Justice Harlan who was even more radical) say that with or without citizenship the acquisition of territory plus organized government carried the Constitution. In the *Rasmussen* case, 197 U. S. 516, the said dissenting judges, with the same possible exception of Mr. Justice Harlan, concurred in the majority opinion to hold that the acquisition of territory plus citizenship plus some congressional action

less than organized government, was incorporation. The doubt in the Rasmussen case was whether any congressional action was necessary where the treaty so plainly conferred citizenship.

In considering the opinion of Mr. Justice White in *Downes* v. *Bidwell,* 182 U. S. 287 *et seq.,* we think it fair to include Mr. Justice Gray along with Justices Shiras and McKenna, because Mr. Justice Gray said that he agreed substantially with the opinion of Mr. Justice White. The latter opinion was agreed to by the majority of the concurring judges and it may be said to have become the opinion of the Supreme Court by its action in the Rasmussen case and, as we think, by the case of *Dorr* v. *United States,* 195 U. S. 138. In the same concurring opinion, what is it that prevents Porto Rico from being considered as domestic territory for all purposes? Nothing other than the lack of citizenship in its inhabitants. On pages 304, 305 and 306, the idea is that the citizenship of the United States must be protected from the unprepared inhabitants of newly acquired territory. The acquisition of territory ought not to incorporate an alien and a hostile people, page 307. Mr. Justice White denies the proposition that millions of inhabitants of alien territory can without the desire or consent of the people of the United States be irrevocably incorporated into the United States, pages 312, 313. He maintains that the Northwest Territory contained practically none but citizens so far as its white population was concerned, pages 319–321. The case of Louisiana represented to him a plain case of the incorporation of the inhabitants of the territory as citizens of the United States, pages 322, 333. "Common citizenship" were the words of the present Chief Justice. "And the same rights were conferred in the same mode by which other territories had previously been incorporated; that is, by bestowing the privileges of citizenship and the rights and immunities which pertained to the Northwest Territory," page 333. Florida was essentially no different and whatever contemporaneous doubt may

have existed it was dissipated by the action of the Government in subsequent treaties, pp. 334, 335 (if not by *American Insurance Company* v. *Canter,* 1 Peters, 511). Alaska contained provision for incorporation inasmuch as citizenship was conferred by the treaty, page 335. "It must follow therefore that where a treaty contains no conditions of incorporation and, above all, where it not only has no such conditions but expressly provides to the contrary, incorporation does not arise until in the wisdom of Congress it is deemed that the acquired territory has reached the state when it is proper that it should enter into and form a part of the American family," page 339. It is to the inhabitants to whom Mr. Justice White is referring. They reach the desired· "state"; not the territory.

"A further analysis of the provision of the Act (Foraker Act) seems to me not to be. required in view of the fact that as the act was reported from the committee it contained a provision conferring citizenship upon the inhabitants of Porto Rico and this was stricken out in the Senate," page 341. Mr. Justice White immediately before was speaking of incorporation.

But if any doubt could remain of the opinion of Mr. Justice White it vanishes before a reading of *United States* v. *Rasmussen.* That case. holds that acquisition of territory and citizenship is practically incorporation, at least with some recognition of the territory by Congress.

Mr. Justice Brown who nominally wrote the opinion of the court in *Downes* v. *Bidwell,* said, page 279: "We are also of the opinion that the power to acquire territory by treaty implies not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants and what their status shall be in what Chief Justice Marshall termed the 'American Empire.' There seems to be no middle ground between this position and the doctrine that if their inhabitants do not become, immediately upon annexation, citizens of the United States, their children,

thereafter born, whether savages or civilized, are such, and entitled to all the rights, privileges and immunities of citizens.'' Mr. Justice Brown was maintaining that citizenship could not go to the inhabitants, nor their children, upon the acquisition of territory. The differentiation for him was the lack of citizenship, a view confirmed by his concurring opinion in the Rasmussen case. There he maintained that more formal action was required by Congress, but he found such formal action in the act for Alaska then under consideration, and which the court was declaring unconstitutional in so far as it attempted to provide an inadequate jury for that territory. For Mr. Justice Brown the essentials for incorporation were acquisition of territory, citizenship of the inhabitants and organized government. He found them all to exist for Alaska. Every other one of the judges who took part in *Downes* v. *Bidwell* would have been satisfied with something less. All three elements exist in Porto Rico if we understand the grant of citizenship. *Downes* v. *Bidwell* does not militate against the theory of incorporation. It supports it and the Rasmussen case, we think, settles the question. Citizenship was conferred by the Congress and the effect of a grant made by a law of that body is equal, if not superior, to a grant made by treaty.

If it be suggested that a particular formula is necessary, this is denied by all the judges who sat in the Rasmussen case, including Mr. Justice Brown. The court says, pages 526, 527:

''The argument by which the decisive force of the cases just cited is sought to be escaped is that as when the cases were decided there was legislation of Congress extending the Constitution to the District of Columbia or to the particular territory to which a case may have related, therefore the decisions must be taken to have proceded alone upon the statutes and not upon the inherent application of the provisions of the Fifth, Sixth and Seventh Amendments to the District of Columbia or to an incorporated Territory. And upon the assumption that the cases are distinguishable from the present one upon the basis just stated, the argument proceeds to insist that the

Sixth Amendment does not apply to the Territory of Alaska, because section 1891 of the Revised Statutes only extends the Constitution to the organized Territories, in which, it is urged, Alaska is not embraced.

"Whilst the premise as to the existence of legislation declaring the extension of the Constitution to the Territories with which the cases were respectively concerned is well founded, the conclusion drawn from that fact is not justified. Without attempting to examine in detail the opinions in the various cases, in our judgment it clearly results from them that they substantially rested upon the proposition that where territory was a part of the United States the inhabitants thereof were entitled to the guarantees of the Fifth, Sixth and Seventh Amendments, and that the act or acts of Congress purporting to extend the Constitution were considered as declaratory merely of a result which existed independently by the inherent operation of the Constitution. It is true that in some of the opinions both the application of the Constitution and the statutory provisions declaring such application were referred to, but in others no reference to such statutes was made, and the cases proceeded upon a line of reasoning, leaving room for no other view than that the conclusion of the court was rested upon the self-operative application of the Constitution. *Springville* v. *Thomas,* 166 U. S. 707; *Thompson* v. *Utah,* 170 U. S. 343; *Capital Traction Co.* v. *Hof,* 174 U. S. 1; *Black* v. *Jackson,* 177 U. S. 349."

And the court analyzes the cited cases.

But if a particular formula is necessary it is given by the Jones Act. The court in *Rasmussen* v. *United States,* 197 U. S. 522, *supra,* says:

"The treaty concerning Alaska, instead of exhibiting, as did the treaty respecting the Philippine Islands, the determination to reserve the question of the status of the acquired territory for ulterior action by Congress, manifested a contrary intention, since it is therein expressly declared, in article 3, that:

" 'The inhabitants of the ceded territory shall be admitted to the enjoyment of all the rights, advantages and immunities of citizens of the United States; and shall be maintained and protected in the free enjoyment of their liberty, property and religion.'

"This declaration, although somewhat changed in phraseology, is the equivalent, as pointed out in *Downes* v. *Bidwell,* of the formula employed from the beginning to express the purpose to incorporate

acquired territory into the United States, especially in the absence of other provisions showing an intention to the contrary. And it was doubtless this fact conjoined with the subsequent legislation of Congress which led to the following statement concerning Alaska made in the opinion of three, if not four, of the judges who concurred in the judgment of affirmance in *Downes v. Bidwell* (p. 335):

" 'Without referring in detail to the acquisition from Russia of Alaska, it suffices to say that that treaty also contained provisions for incorporation and was acted upon exactly in accord with the practical construction applied in the case of the acquisitions from Mexico as just stated.' "

The words in the Jones Act are even more sweeping. "All citizens of Porto Rico * * * are hereby declared, and shall be deemed and held to be, citizens of the United States." The act does not say, as did the treaty of Alaska, that the inhabitants shall have the privileges of citizens. It declares them citizens forthwith. The association of the inhabitants of Porto Rico with the people of the United States is made complete. The people of the continent of the United States and the people of Porto Rico are citizens of a common country.

It has been argued by the Government that the Jones Act does not contain an unqualified grant of citizenship by reason of the proviso permitting renunciation within six months. While there are in the books, among others, the distinctions of adults and minors, men and women, sane and insane, there are in the United States no grades of citizenship. The act grants collective citizenship and it is a matter of current history that before its final determination by Congress there was a question whether collective or elective citizenship should be conferred. In the earlier stages of the situation there was a tendency towards a grant in optional form. This problem may not have been settled when the Jones Act first took shape. If the earlier tendency had prevailed and citizenship was not only conferred on those who went through a sort of matriculation, as they call it in South America, there

might be some force to the argument. However, the citizenship finally granted affected the whole body of the people of Porto Rico equally and cannot be distinguished from the citizenship of the United States. While the Declaration of Independence forms no part of our written law its tradition has been enough to prevent any distinction in our citizenry. This being true we cannot, especially in the absence of a provision similar to the prohibition clause, impute to Congress an intention to grant a qualified citizenship. It merely permits the unwilling ones to retain their quasi-alien status. The proviso at best must be taken as a condition subsequent or a defeasance, and collective citizenship would in any event apply until the condition or defeasance took place. *Oregon & California R. R. Co.* v. *United States,* 238 U. S. 231, 239. But it would seem absurd to suppose that Congress had in mind a citizenship subject to any such defeasance.

The act contemplates unlimited citizenship. The officials must be citizens, section 10. The voters in the elections must be citizens, section 35. The Resident Commissioner at Washington must be a citizen, section 36.

There are certain data and indicia which are supposed to override the grant of citizenship and to prevent incorporation. Foremost among these is that the Jones Act in the "Bill of Rights," section 2, sets forth practically every other privilege and immunity guaranteed by the first ten amendments to the Constitution of the United States, but omits presentment by grand jury and trial by jury. Incorporation following from citizenship, there is no strong incongruity in certain rights being mentioned and emphasized, especially the most fundamental ones, and omit to mention others that are also a consequence of incorporation. In any event the grant of citizenship is unequivocal and the whole act should be construed favorably to the grantee. This is the common-law rule for deeds and grants. For a franchise and like matters the public have an interest and they are taken against the grantee. But the people of the United States have no

interest in excluding from incorporation the common citizen-
ship of the United States. The grant of citizenship over-
rides any other doubtful expression of intention. Congress
cannot concede citizenship to the inhabitants of an organized
territory and at the same time deprive them of the privileges.
of citizenship.

Section 1891 of the Revised Statutes has been mentioned.
It operates for incorporated territories automatically and
the fact that Congress only mentioned in the Jones Act the
statutory laws of the United States does not call for the
application of the maxim of *expressio unius est exclusio al-
terius.* Section 1891, for the purposes of the opinion, is negli-
gible or nugatory.

The giving of a different system of revenue where the
revenues are turned into the local treasury is not an unusual
thing for an incorporated territory. *Binns* v. *United States,*
194 U. S. 486.

The providing of any different system of political rights
is likewise in the sphere of Congress. *Murphy* v. *Ramsey,*
114 U. S. 15, and cases cited; *Mormon Church Case,* 136
U. S. 1; Insular cases *passim.*

The exclusion of the Interstate Commerce Act and the
Safety Appliance Act was probably within the power of
Congress. Local conditions are different in this territory.
*Ponce Lighter Co.* v. *Municipality of Ponce,* 19 P. R. R. 725,
and *People of Porto Rico* v. *Central Fortuna,* 22 P. R. R.
100. If not, the particular provisions would have to be held
unconstitutional. That particular provisions may be so de-
clared is familiar law and of that order was the judgment
in the Rasmussen case.

The history of the incorporation of the territories of the
United States has been traced in the Insular Decisions and
in the Rasmussen case. It has also been made the subject
of an able and elaborate opinion of Mr. Justice Hamilton in
the matter of Carlos Tapia recently decided. Given the ante-
cedents and especially the Rasmussen case it follows that,

while some of the judges of the Supreme Court have held that less is sufficient, all have agreed that the acquisition of territory plus citizenship plus organized government is incorporation. In Porto Rico the only difference is that citizenship was the last concession. To hold that incorporation is not here is to say that the acquisition of territory plus organized government plus citizenship in the case of Porto Rico is not equal to the acquisition of territory plus citizenship plus organized government in the case of Alaska, the equivalent of denying the algebraic truth that $a+b+c=a+c+b$.

One consideration, which is perhaps one of the most important, we have reserved for the end. The theory of those who would maintain that Porto Rico has not been incorporated depends for its validity on the condition of things created by the Treaty of Paris. Again, we think there is failure to comprehend the scope of the Insular Decisions. There it was laid down only that under the Treaty of Paris none of the Insular territories could be incorporated until Congress acted. It was not said, and the facts and the historical precedents denied it, that the application of the whole Constitution to given territory was solely or always dependent on Congress or much less on an indubitable expression of intention by Congress. Lord Mansfield said long ago that when a statute had become beclouded by reason of interpretation it was well to go back to the statute. The particular positive words which differentiated the treaty from previous treaties were the following: "The civil rights and political status of native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress." In these words there is no allusion to the territory as such. The inhabitants of the territory were in the minds of the high contracting parties. If the treaty controlled, the only thing left to Congress was the determination of the civil rights and political status of the native inhabitants. Therefore, said the Supreme Court,

until Congress acts there is no incorporation. But Congress always controls the political status of any territory, incorporated, organized or merely appurtenant. Congress at the time of *Downes* v. *Bidwell* had just made an organized territory of Porto Rico. Congress can determine the political rights of a territory even when exclusively inhabited by citizens. But, said the Supreme Court again in the Insular Cases, Congress has not acted on the civil rights of the inhabitants. It has not made them citizens. But Congress did so on March 2, 1917, and Congress must be conclusively presumed to have intended all the consequences of the act. The Jones Act in form is complete in itself. If sections 2, 3, 4 and 5 of the Jones Act had been substituted for section 7 of the Foraker Act we cannot imagine that the Supreme Court, in view of the grant of citizenship, would not have said at the time of the Insular Decisions that Congress had exhausted such residuary power as had been bestowed upon it or left to it by the treaty. The rights of the inhabitants are completely defined. They are the same as those of citizens of the United States, for the inhabitants are such citizens.

For an incorporated territory the Fifth Amendment is necessarily applicable. *United States* v. *Rasmussen,* 197 U. S. 516, *supra,* and cases cited; *Callan* v. *Wilson,* 127 U. S. 540; *Thompson* v. *Utah,* 170 U. S. 343; *Capital Traction Co.* v. *Hof,* 174 U. S. 1.

We are asked to annul this writ because the legislature has had no chance to establish a grand jury. We are inclined to agree with the Attorney General that the legislature to meet in August is the real legislature of the incorporated territory. We are cited to the case of *Hawaii* v. *Mankichi,* 190 U. S. 197, as authority for the validity of the proceedings in the case before us. One of the notable differences is that Hawaii had been a full independent sovereignty and the court was construing the intention of two sovereigns, as to when the Constitution of the United States should apply to Hawaii.

In that case the prisoner had been condemned and so had others. Under the Jones Act the privilege of the Constitution attached immediately and the petitioner as a citizen is entitled thereto. But even supposing that *Hawaii* v. *Mankichi* would be authority to support a conviction obtained before the legislature had a chance to act, we see no reason in the instant case where there has been no trial, not to give the petitioner the privilege sought.

For these reasons the information and all the subsequent proceedings in this case must be annulled.

*Petition granted.*

Chief Justice Hernández and Justices del Toro, Aldrey and Hutchison concurred.