(No. 5172.   July 3, 1929.)

STATE, Respondent, v. J. M. JENSEN, Appellant.

[280 Pac. 1039.]

E. P. Barnes, for Appellant.

W. D. Gillis, Attorney General, and Leon M. Fisk and Fred J. Babcock, Assistant Attorneys General, for Respondent.

BUDGE, C. J.—Appellant and one Abbott were charged jointly with the crime of conspiracy with one another and with J. W. Greenstreet and C. R. Love, between the dates of September 1, 1926, and March 29, 1927, to obtain property and money by false pretenses "from such divers persons as they, the said defendants could induce to believe and act on such false pretenses," by representing that certain bonds of the Chicago, Rock Island & Pacific Railroad Company, issued in 1902, and in the possession of the said defendants, were good, valid and marketable bonds, worth their face value, that said bonds were listed in stock market quotations appearing in current newspapers, and that said Chicago, Rock Island & Pacific Railroad Company was during all of said times an operating company, "whereas in truth and in fact said pretenses . . . . were utterly false and fraudulent, as the said defendants and each of them then and there well knew." Neither Greenstreet nor Love was ever apprehended or brought to trial. Abbott was acquitted, but appellant was convicted, and he appeals from the judgment and an order denying a motion for new trial.

We shall advert briefly to certain pertinent facts adduced upon the trial. Ivan Nelson had worked for appellant, and in 1925 purchased an automobile from him. In January, 1927, appellant went to Nelson's place of business and requested him to sell the car to a buyer appellant had in view. Nelson agreed to take $1,500 for the car and appellant stated that he would ask $1,600 for it and thereby make $100 for himself. Nelson testified that appellant told him the prospective purchaser did not have the ready cash, but did have some railroad bonds, and that these were "A-1 bonds, as good as $20-gold-pieces," which it was thought the party would like to put up as security for a while. Later, appellant introduced to Nelson as the man inter-

ested in the car, a Mr. Love, and after a demonstration of the car to Love he produced some bonds and asked Nelson to take them as security for the purchase price of the car, and said he would redeem the bonds in less than thirty days. After Love had stated that a quotation of the bonds could be found in a newspaper and appellant had pointed out to Nelson in a newspaper procured for that purpose what purported to be a stock market quotation of the bonds in question, the automobile was delivered to Love, together with a bill of sale, and in return therefor Nelson was given two bonds of the Chicago, Rock Island & Pacific Railroad Company, each of the denomination of $1,000. A few days after this transaction, in a conversation with appellant, Nelson was advised that appellant had taken possession of the car as security for a loan to Love. Appellant sought to dissuade Nelson from endeavoring to secure a loan from a local bank, with one of the bonds as security, stating that the bank would take the number of the bonds, and if there should be anything wrong with the bonds, if they were stolen bonds, they would be taken away from Nelson. After the expiration of thirty days from the time the bonds had been left with Nelson, he reminded appellant of this fact and appellant stated that he also was worried about the bonds and suggested that Nelson ''peddle them to someone else and let somebody else hold the sack.'' Nelson then took the bonds to the First National Bank in Boise, and was informed that they could not be sold or hypothecated for a loan, and advised appellant that he had the bonds investigated through the bank and was told that they were worthless.

In November, 1926, according to the testimony of state's witness Graff, appellant told him he had some bonds which could be used in the purchase of a bus and would allow Graff to use them for that purpose. Graff took one of the bonds to an official of the Pacific National Bank, who had an investigation made through the Childs Bond & Mortgage Company, and the bond was subsequently returned by Graff to appellant with the information that investigation

disclosed the bonds were without value. On being shown the two bonds used in the Nelson deal, above referred to, witness Graff stated they were of the same description as the bond which appellant had delivered to him.

It was related by state's witness Vandenberg that in January, 1927, appellant, who was introduced to the witness as "Mr. Abbott," and a man calling himself J. W. Wilson, came to the place of business where the witness was employed, Wilson stating that he was interested in the purchase of an automobile, but "guessed it was practically out of the question, because he didn't have his money right now." "The fellow that was with him, Mr. Abbott, as I understood [identified by the witness as appellant], he spoke up and said, 'Why don't you put up these bonds?'" Wilson then told the witness he had some "Rock Island" bonds, "and wanted to know if there was any chance of buying the car if he put these up for ten or thirty days." Vandenberg told Wilson they could "do business" if the bonds were properly identified. The next day the same two men again came to the witness' place of business, handed certain bonds to him, and were told the bonds could not be accepted until a banker was consulted. Vandenberg started to write down the numbers of the bonds, "and Mr. Abbott, as I understood the other fellow to be, he said, 'you don't want to sign any note, you want a bill of sale.' So Wilson took the bonds out of my hand, and that is the last I saw of them."

E. J. Hilton testified for the state that appellant owed him $4,800, and in December, 1926, appellant asked him if he would accept $4,000 cash in settlement of the debt. Hilton told appellant this would be agreeable, whereupon appellant stated that he had some bonds, or that he could trade for some bonds, and that appellant would either sell the same for $4,000 and turn the cash to Hilton, or Hilton could take the bonds themselves. Hilton said he would prefer the bonds, provided, after an investigation he found them what appellant represented them to be or what they purported to be. Four bonds of the Chicago, Rock Island &

Pacific Railroad Company, each of the denomination of $1,000, were delivered to Hilton by appellant. Hilton had the bonds investigated, was informed that they were without value, and conveyed this information to appellant.

From the testimony set out above it is apparent that appellant had been advised from two different sources, in November and December, 1926, that the bonds were of no value, and later dealt with witnesses Nelson and Vandenberg looking to the transfer of the same, or similar, bonds to them with this information. It also may be stated that what were represented by appellant and C. R. Love, *alias* J. W. Wilson, to be quotations of Chicago, Rock Island & Pacific Railroad Company bonds in the "Portland Oregonian," mentioned by them in the transactions with Nelson. and Vandenberg were not in fact quotations of the bonds of that company but related to bonds of the Chicago, Rock Island & Pacific Rail*way* Company.

Among other evidence offered by the state to prove that the bonds were without value, certain certified copies of the record of the proceedings in an action in foreclosure against the C. R. I. & P. R. R. Company, in the federal district court for the southern district of New York, were admitted in evidence. While in these voluminous records there may have been some matter not entirely relevant to the point for which the records as a whole were admitted to prove, we do not find therein anything that would be calculated to inflame or prejudice the minds of the jury against appellant. The records indubitably did tend to establish that a trust agreement, whereby certain collateral securities had been hypothecated as security for the payment of a bond issue of the C. R. I. & P. R. R. Company (the bonds of which were identical in description with bonds exhibited and used by Love and appellant in the transactions above referred to) had been foreclosed, a sale of the securities had, certain payments indorsed on the bonds and that a deficiency remained against the payment of the bonds, after the application of all known assets of the company, of many millions of dollars. It appears clearly

enough from a perusal of these records that they are of sufficient probative force to establish that after the institution of the proceedings for foreclosure of the trust agreement and subsequent proceedings relating thereto, all of which took place some ten years previous to the trial of this cause, the bonds in question were of no further value. There is no merit to the contention of appellant that the admission of the records was prejudicial error resulting in a denial to him of a fair and impartial trial.

The witness Childs, for the state, a dealer in bonds and investments, was shown to have been engaged in and familiar with that business for a period covering a number of years, and during the course of his examination excerpts from issues of the Commercial and Financial Chronicle for January 2, 1915, and January 1, 1916, showing listings of the bonds of the C. R. I. & P. R. R. Company were read to the jury. The witness testified that ''The Chronicle'' was a reliable and leading organ in his business and its reports recognized as authentic. We think there is no question of the propriety of allowing such matter to go to the jury, under the authorities.

''Accredited price current lists and market reports, including those published in trade journals or newspapers which are accepted as trustworthy, are admissible in evidence on the question of market value of railway stock.'' (*Virginia v. West Virginia*, 238 U. S. 202, 35 Sup. Ct. 795, 59 L. ed. 1272. See, also, *Henry v. Kopf*, 104 Conn. 73, 131 Atl. 412; *Sisson v. Cleveland & T. Ry. Co.*, 14 Mich. 489, 90 Am. Dec. 252; *Rice v. Eisner*, 16 Fed. (2d) 359; 3 Wigmore on Evidence, sec. 1704.)

For similar reasons, it was not improper to allow witness Childs to answer the question concerning the quotation of the bonds in a particular newspaper.

The qualifications of this witness as to his knowledge and familiarity with the matter upon which he was interrogated were not questioned, and he was entitled to answer the questions asked him as to the inference that might be drawn, or, in his opinion, the effect upon the value of the

bonds, by reason of their not being quoted in the financial publication referred to.

Adverse rulings of the trial court on objections interposed by appellant to questions asked of two of the state's witnesses are assigned as error. The questions propounded to the witness Smith regarding his having seen C. R. Love sign a hotel register and as to whether there was only one registration made at that time may have been immaterial, but they were not of such character as to call for testimony of any damage to appellant or as to affect any of his substantial rights before the jury. The question asked the witness Nelson: "In what form was that information obtained by Code, if you know?" was but a preliminary question, and was not prejudicial to appellant.

During the direct examination of the witness Hilton, and in the course of which it was brought out that in pursuance of the investigation as to the value of the bonds he had received from appellant a telegram had been delivered to him which he in turn delivered to appellant, the prosecuting attorney stated: "I would ask the defendant to produce the telegram at this time." Prompt exception to the statement was taken by counsel for appellant, and the court thereupon stated to the jury that "the defendant is not required to produce anything that is desired as evidence against himself, and the jury will disregard the question of counsel." While a statement of the nature objected to is not to be countenanced, it is noted from the record that no objection was made to the testimony of the witness as to the contents of the telegram. The statement of the prosecuting attorney does not call for a reversal of the judgment. (*Woodward v. United States*, 38 App. D. C. 323; *People v. Chapman*, 55 Cal. App. 192, 203 Pac. 126.)

What is contended by appellant to have been a misstatement of the evidence during the argument of the special prosecutor was cleared up by having the testimony in question read to the jury.

A hotel register, among the pages of which were two other written instruments, none of which was admitted in

evidence, have been certified to this court in the exhibits, and appellant assumes these went to the jury in place of another hotel register admitted in evidence. No positive showing is made that such was the fact, and we cannot indulge in such presumption. Error will not be presumed, but must be affirmatively shown.

From an attentive examination of the entire record in the light of all the assignments of error, it is convincing that the evidence is abundantly sufficient to support the verdict of the jury. The judgment and order denying the motion for new trial are affirmed.

Givens, T. Bailey Lee, Wm. E. Lee and Varian, JJ., concur.

Petitions for rehearing denied.