COBBS & MITCHELL v. BOYNE CITY TANNING CO.

SALES—CONTRACTS—INTERPRETATION.

Under an agreement for the purchase of hemlock bark taken from lands in the lower peninsula, which produces better bark than that obtained from timber in the upper peninsula, the contract providing that the price should be determined by the average contract price paid by tanners

in certain specified markets in their first large contracts for the year, the price paid for bark obtained from the southern peninsula should be the basis, and not the price of bark from · the northern peninsula, which was less valuable.

Error to Kent; Brown, J. Submitted October 10, 1913. (Docket No. 14.) Decided December 20, 1913.

Assumpsit by Cobbs & Mitchell, a corporation, against the Boyne City Tanning Company for goods sold and delivered. Judgment for plaintiff. Defendant brings error. Affirmed.

*Clapperton, Owen & Hatten (J. E. Converse,* of counsel), for appellant.

*Norris, McPherson & Harrington,* for appellee.

MOORE, J. Plaintiffs have been selling to defendant hemlock bark since 1901, on an average of something more than 2,000 cords a year. In 1910 the plaintiff delivered 886 1/128 cords. There was paid thereon $8,500. A dispute arose as to the balance due. Litigation followed, and the case was tried before the judge, who made findings of fact and law and gave judgment in favor of the plaintiffs in the sum of $1,335.93. The case is brought here by writ of error.

The suit involves the construction of a written contract, the material parts of which are as follows:

"Witnesseth: That whereas, said party of the second part contemplates the erection and operation of a tannery at Boyne City, Michigan, and desires to secure a supply of hemlock bark from time to time for the purpose of carrying · on his tannery operations, and whereas said party of the first part hereto, are the owners of land in various counties contiguous to Boyne City, which lands contain a. considerable amount of standing hemlock, it is therefore agreed by and between the parties:

"(1) And whereas, the Boyne City & South Eastern Railroad have agreed with said Cobbs & Mitchell,

Inc., to accept said first party's hemlock bark, on cars at the junction point of said first party's railroad with the Thumb Lake Branch of said Boyne City & South Eastern Railroad, and to deliver said bark, during the life of this agreement, at fifty cents per cord to the tannery siding of the tannery at Boyne City, Mich., to be erected by W. S. Shaw as aforesaid:

"That the said first parties in consideration of the agreements by said second party, hereinafter contained, to be performed by him, hereby agree that they will sell to said second party such hemlock bark as may be peeled by them from year to year from said lands contiguous to Boyne City—except in case lumber conditions should be such that said first parties may consider it to their disadvantage to cut and peel hemlock in any one year, and also excepting such bark as may be taken from lands owned by said first party east of the Michigan Central Railroad, and such bark as may be peeled from lands which are naturally tributary to the Grand Rapids & Indiana Railroad—said bark to be delivered to said second party f. o. b. cars at tannery siding at Boyne City, Michigan (at a price to be determined and based on the average contract price of the tanners in Chicago, Kenosha, Milwaukee, or other principal tannery points, when they are making their first large contracts for the current year, after deducting the sum of ten cents per cord for loading from cars over rail vessel), which ten cents per cord shall not be allowed in case vessel men at any time during the life of this contract shall eliminate said charge in taking bark from the docks at Boyne City to the above points, and, after deducting the cost of transportation from Boyne City to the above points, such cost of transportation to be determined by the average cost of transportation by vessel during the months of July and August in the year preceding the year in which said bark is to be delivered. In case the parties to this agreement shall be unable to agree upon the price and cost of transportation, under the terms and conditions heretofore provided, then each party shall select a competent person to act for them in determining such price, and in the event of said two persons being unable to agree upon the price under the terms

and conditions herein provided, then said two parties shall select a third person agreeable to both of them and said third person, or a majority of the three shall fix and determine the price to be paid for said bark for such year.

"All such bark shall be properly cured and shall be good, sound, merchantable hemlock bark, cut four feet in length and piled as flat as is customary for such bark to be piled, and to be as free from broken bark as possible. Any bark delivered short in length, curly or mouldy, or otherwise inferior to sound bark, shall be taken at a reduced price. All bark is to be carefully loaded on flat cars in two tiers, lengthwise of the cars, to be loaded not less than 6 ft. 6 in. high; the measurements and inspection of said bark to be determined by the agents of the respective parties hereto, on board cars at tannery, proper deductions being made for short and curly bark and other defects.

"(2) Said party of the second part agrees to buy the bark of said first parties as provided in paragraph 1," etc.

There was testimony in the case that, when the contract was made, there was marketed in the towns named in the contract hemlock bark from Wisconsin and from the Lower Peninsula of Michigan, and that there was marketed there small quantities from the Upper Peninsula of Michigan. There was also testimony to the effect that, when the dispute arose, large quantities of bark from the Upper Peninsula found its way into these markets, and that the bark from those localities is not so valuable as the bark named in the contract because they give a smaller cord of bark, and from the Upper Peninsula it is winter bark upon which is snow and ice, and that better results are obtained from the Lower Peninsula bark.

The plaintiff claimed that, under the provisions of the contract, the price of the bark in controversy in this suit delivered in 1910 should "be determined by the average contract price of the tanners in Chicago, Kenosha, Milwaukee or other principal tannery

points, when they are making their first large con-
tracts for the current year," based upon bark from
the Lower Peninsula of Michigan only; that, if the
defendant's interpretation should prevail, it would
allow him to purchase No. 1 bark with full cords at a
price of cull bark, with a smaller cord, and it ought
not to be contended this is a fair or correct interpre-
tation of the language used in the contract.

It is the claim of appellant that in 1910 his atten-
tion was first called to the fact that large contracts
for bark were being made between Upper Peninsula
dealers and purchasers in the markets named, where-
upon he investigated the situation, and, finding that
to be true, he immediately called the attention of the
parties under the contracts thereto and insisted, in
the settlement for the plaintiff's product in 1910, that
those contracts should be included in determining the
average price under the contract in this case. He in-
sists that the contract contained no limitations what-
ever as to the territory from which the bark received
in the market centers, named, should come; that the
contract is clear, unambiguous, unequivocal, and ex-
presses an intention, and therefore presents nothing
for judicial interpretation; and that under the con-
tract the price of bark delivered in 1910 should be
determined by the "average contract price of the tan-
ners in Chicago, Kenosha, Milwaukee, or other prin-
cipal tannery points, when they are making their first
large contracts for the current year" without limita-
tion as to the territory from which bark under those
contracts should come.

In deciding what construction should be given to
the contract, it may be well to illustrate: Suppose
that because of the cutting away of the forests the
timber line had receded to the north, and because of
climatic conditions, or for other reasons, the bark
stripped from the northern hemlock contained so
greatly an increased percentage of tannin as to com-

mand a much higher price than the southern grown; would it be claimed that the plaintiffs should benefit because of the higher price for the more valuable bark? On the other hand, suppose the demand for bark has increased much more rapidly than the supply, so that purchasers are obliged to take what they can get, and are now buying bark of a quality for which there was no market when the contract under consideration was made; should it be claimed that under such circumstances the price paid for the inferior bark should be considered as a factor in deciding what is the average contract price which should control this contract? To ask these questions is to suggest an answer. In rendering judgment for the plaintiff, the trial judge construed the contract according to the contention of the plaintiff. We think this was the proper construction.

Judgment is affirmed.

STEERE, C. J., and McALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.