### AMERICAN CAR & FOUNDRY CO. v. EAST JORDAN FURNACE CO.

(Circuit Court of Appeals, Seventh Circuit. April 26, 1921.)

No. 2869.

Sales ⟵77(1)—Pig iron contract as to price construed.

Where pig iron contract provided that the price for each month should be the average of market price quotations from a trade journal, minus 50 cents per ton and the average freight rate between the place of manufacture and Chicago, no mention being made of different grades of iron, and in time manufacturing conditions changed, so that there was a greater spread between the various grades than existed at the time the contract was made, the fact that the lower priced grades, which were the grades in fact preferred by the buyer, constituted the bulk of the output, and that the tonnage of the highest quoted grades was comparatively very small, did not justify the buyer in changing from the prior method of computing the price by averaging the highest and lowest quotations, regardless of grades, and, ignoring the quoted prices on such grades as were

---

not represented in the monthly production, considering only such grades as had been produced by the seller.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Action by the East Jordan Furnace Company against the American Car & Foundry Company. Judgment for plaintiff, and defendant brings error. Affirmed.

John R. Montgomery, of Chicago, Ill., for plaintiff in error.

Edgar Bronson Tolman, of Chicago, Ill., for defendant in error.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

ALSCHULER, Circuit Judge. The action was upon a contract whereunder plaintiff in error, Car Company, agreed to buy, and defendant in error, Furnace Company, agreed to sell for the term of 10 years from December 4, 1909, the Furnace Company's entire output of standard Lake Superior charcoal pig iron up to 25,000 tons per annum. It was specified that the price for the iron shipped in any calendar month shall be determined as follows:

"The average market price per ton of Standard Lake Superior charcoal pig iron, Chicago delivery, during each month, shall be first ascertained. The market price from time to time shall be taken to be the price quoted in the Iron Age in its issues for that month; e. g., should the four issues of Iron Age during any month show quotations on standard Lake Superior charcoal pig iron, Chicago delivery, as follows:

First issue ..........................................$18.50 to $19.50
Second issue .......................................... 19.00 to 19.50
Third issue .......................................... 19.50 to 20.00
Fourth issue .......................................... 20.00 to 20.50

then the average price of such pig iron, Chicago delivery, would be $19.50 per ton. From this average price, Chicago delivery, shall be deducted 50 cents per ton, and also the average freight rate during such month from East Jordan to Chicago. The remainder will be the price per ton of twenty-two hundred and forty (2,240) pounds to be paid to Furnace Company for the pig iron sold under this agreement for such month, f. o. b."

For the first five years of the contract period the price of the delivered iron was computed and paid in accordance with the method set out. During this time the quotations in Iron Age (a weekly trade paper for the iron industry) were in the form set out in the contract, which had been the form of the quotations for years prior to the contract. Early in 1915 the Iron Age changed the manner of quotation upon such iron, to show the market price on various grades of the iron. It seems that there have always been different grades of the iron, determined by the extent of its silicon content; the larger proportion of silicon generally bringing the higher price, where there was difference in the price of the grades. There were recognized in the trade about fourteen grades.

In the smelting of the iron various grades were unavoidably produced, because of the impossibility of maintaining uniform heat. Whether during the early years of the contract the high and low figures reported in the Iron Age represented to any degree differing prices of the grades or the variation of the iron generally without

reference to grades, is not clear from the evidence; but that there was more or less difference in price of some of the grades during the last five contract years is well established. Grades 2, 3, 4, and 5, generally the lower priced grades, and indeed those which the Car Company preferred, constituted the bulk of the output; the tonnage of the highest quoted grades being comparatively very small.

When Iron Age began quoting figures on the grades, the Furnace Company computed its price by taking the highest and lowest quotation shown for the issues of the month, and averaging them; the figures being taken regardless of the grades that had been actually produced. But the Car Company contended that this change in the mode of market price quotation necessitated change in the manner of the computation, and insisted that the proper method was to ignore entirely the quoted prices upon such grades as were not represented in the production during such month, and that only such grades as had been produced by the Furnace Company should be considered. These they figured at the quoted price and divided the sum by the total tonnage shipped, which, less the 50 cents per ton, was the price per ton which the Car Company insisted it should pay, and it was upon this, or substantially this, method that the Car Company, against protest of the Furnace Company, made its computation and payments from month to month. Upon the approximately 100,000 tons of ore involved during this period of the contract, the difference in price under the two methods is somewhat over $60,000, for which the Furnace Company brought the action. Jury was waived, and the cause submitted to the court, which did not adopt either method in its entirety, but obtained the average of all of the quoted prices as the basis of computation, deducting therefrom the 50 cents per ton. This yielded a result of $59,052.38, for which judgment was rendered. The Furnace Company assigns no error on the mode of computation which the court adopted.

In the contract itself there is no ambiguity in its provisions for the ascertainment of the price. While the contract was made in the light of the fact that various grades of this iron would be inevitably produced, which might, even if at the time they did not, vary in the market price, no mention whatever was made of grades; but the contract was for the entire output up to a fixed maximum, and the provision for fixing price was for the taking of the quoted figures in Iron Age, wholly regardless of whether in fact, then or thereafter, the figures might apply to one grade or to another, and regardless, also, of the grades which were in fact produced.

The contract does not provide that the price to be paid for the iron shall be the market price, but market price quotations from Iron Age were to be the basis upon which the price under the contract was to be fixed by averaging all the figures for the month as shown in Iron Age. It might be that the highest figures quoted would represent but a very small tonnage of iron which during the period covered by the quotation actually sold at that price; and if grade and quality of the iron had in fact anything to do with the price, as well might have been the case, a small quantity of the superior quality sold at the higher price would be the basis for the higher figure. This, of course, would

redound to the advantage of the Furnace Company, if it had actually produced but little of the higher priced iron; and if the converse were true as to the lower price quotation, this would operate to favor the Car Company. But, as has been observed, the contract was not to pay market price, but the average of market price quotations in Iron Age according to the method indicated. Nor in our view of the contract was the average necessarily limited to two figures. The two figures given in the contract were simply by way of illustration. Had there been at times no variation to report, one figure might have been reported for such weeks, and this would not have changed the contracted method of fixing the price; and if by reason of a subsequent greater spread in prices of different grades several figures should be quoted, we do not perceive why the taking of all in arriving at the average market price would be in derogation of the method prescribed in the contract.

If it were conceded that the change in quotation produced such an uncertainty or ambiguity in the Iron Age quotations as to make impossible an application of the contractual method of price fixing, and that the actual market price of the various grades produced must be taken, it would follow that the Car Company could not then deduct the 50 cents per ton, since this deduction was but one of the elements in the fixing of the price; the deduction being, not from the market price of the iron actually produced, but from the average of the prices quoted in Iron Age. The fact that in the course of time manufacturing conditions and exigencies arose whereunder there was a greater spread in price between the various grades than existed, if any there did exist, at the time the contract was made, does not render ambiguous and uncertain that which was plain and certain at the inception of the contract.

"The contract is still to be interpreted according to its true intent, although altered conditions may have varied the form of fulfillment." Virginia v. West Virginia, 238 U. S. 202, 236, 35 Sup. Ct. 795, 809 (59 L. Ed. 1272).

The fact that the changed conditions of manufacturing demands, and of the markets, and of the Iron Age quotations, may, under the peculiar conditions of the change, give one party or the other some advantage as against actual market prices upon the actual output produced and sold, must not be suffered to modify the sufficiently clear terms of the contract as the parties made it.

It seems that for about the last five months of the contract period Iron Age made further change in the manner of its quoting such iron, by quoting only one figure for "iron of average silicon 1.50, other grades subject to usual differentials." As to what these differentials were, the parties agreed, and in making the computation the court added to the base price given in the Iron Age quotation the excess for each grade wherein, because of larger or smaller content of silicon the market price was higher or lower, then adding them together and dividing by the number of prices. Iron Age thus supplying by apt reference the figures on the various grades, we find no error in this mode of computation for that time.

For many years there appeared weekly elsewhere in Iron Age certain comparative figures on market prices of such iron, to now adopt which for these calculations would be of material advantage to the Car Company, and which it was suggested should be adopted for the time in question. These figures are not referred to in the contract, and both parties, through long and uniform practice under the contract, have not employed them, and have not during the contract period recognized them as having any place or influence in fixing prices under the contract. The court was justified in ignoring those figures.

The views above expressed make it unnecessary to consider the assignments of error respecting the rulings of the court upon the admission of evidence, save only to say that, finding no insuperable difficulty in applying the Iron Age quotations to the contract in the fixing of prices, the rulings of the court upon questions of admissibility of evidence were proper.

We are of opinion that the judgment fairly represents the excess of the full contract price over the amount which the Furnace Company has received, and, no error appearing, the judgment is affirmed.