## MICHLOVITZ & COMPANY *v.* EASTERN ROLLING MILL COMPANY.

### EASTERN ROLLING MILL COMPANY *v.* MICHLOVITZ & COMPANY.

[Nos. 80, 81, October Term, 1929.]

*Decided February 7th, 1930.*

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Edgar Allan Poe* and *Edgar Allan Poe, Jr.,* with whom were *Bartlett, Poe & Claggett* on the brief, for Michlovitz & Company.

*Charles Markell* and *Thomas J. S. Waxter,* for the Eastern Rolling Mill Company.

SLOAN, J., delivered the opinion of the Court.

These are cross appeals from the decree of the Circuit Court of Baltimore City on a supplemental bill filed by the plaintiff, Michlovitz & Company, a co-partnership, against The Eastern Rolling Mill Company, a corporation, praying the construction of a contract for the sale by the defendant to the plaintiff of its bundled scrap and its crop ends and the scale of prices to be paid for it during the life of a five year contract entered into as of the first day of October, 1927.

The same contract was before this court on a bill for

specific performance filed by Michlovitz & Company, which was resisted by the defendant on the ground that its general manager, L. J. Jones, had exceeded his authority in making the contract and that its terms were so unconscionable as to amount to a fraud on the defendant. This court, in an opinion by Judge Parke, in 157 Md. 51, sustained the contract and affirmed the decree of the circuit court for specific performance. One month from the date of the decision in the first appeal the plaintiff filed a petition alleging that the defendant had violated one of the provisions of the decree by selling fifty-eight and a half tons of crop ends scrap to the Van Allen Company, of Northumberland, Pa., and had refused to accept payment for the bundled scrap at the price fixed in the agreement for its sale by the defendant, and that it had demanded payment at a rate quoted by the "Iron Age" on a higher grade of bundled scrap, and prayed an order on the defendant to show cause why it should not be adjudged guilty of contempt of the decree of August 15th, 1928, which was the decree first appealed from, to which the defendant, after an order to show cause, answered. Before any action was taken on this petition, which was dismissed by order passed July 29th, 1929, as of the 5th day of June, 1929, the plaintiff, on June 7th, 1929, filed a supplemental bill wherein it prayed, (1) a construction of the contract of September 30th, 1927, as to the proper method of ascertainment of the price to be paid each quarter for the defendant's bundled steel scrap, (2) a definition of what croppings or cuttings from steel bars the plaintiff is entitled to receive from the defendant, and (3) an order restraining the defendant from refusing to accept payment on the basis of three dollars per ton less than the "Iron Age" quotations covering the Philadelphia market for bundled sheets (for steel works) and no other.

In its answer and cross bill to the supplemental bill the defendant alleged that it was not bound by the single quotation in the "Iron Age" for the Philadelphia market of bundled sheets (for steel works), but that, beginning with the first quarter of 1929, the "Iron Age" no longer publishes a

single quotation for all bundled sheets for steel works, but publishes three quotations, two for hydraulically compressed sheets, new and old, and one (formerly applicable to hydraulically bundled sheets as well as hand bundled), applicable no longer to hydraulically compressed sheets, but now only to "hand bundled sheets", and that since the addition of these quotations for hydraulically compressed sheets there should be applied, to the sheet steel scrap of the defendant furnished to the plaintiff, the quotations for hydraulically compressed bundled sheets, new or old, which run approximately from $3.00 to $4.00 more than the price for hand bundled sheets, and that, whatever form the package or bundle of the defendant took, there should be applied to it the current classification of the "Iron Age" for the Philadelphia market and that the plaintiff should pay accordingly. It appears that the plaintiff has made payments to the defendant at the rate of $8.25 per ton, which is in accordance with the quotations in the "Iron Age" prior to January, 1929, and is $3.00 less than the quotation for the Philadelphia market for bundled steel scrap, but that the plaintiff has refused to pay the balance of $3.75 per ton demanded by the defendant.

In its answer the defendant admitted that, in November and December, 1928, it had sold and shipped to the Van Allen Company of Northumberland, Pa., about two hundred tons of cut sheet bars, but contends that these were not crop ends but full, usable lengths, ranging from thirty to fifty inches, which had been cut for manufacturing, had been accumulating for about three years, and before 1926 had been used as "warming-up steel," and that the practice of so using them had been discontinued in 1926 because of the installation of electric roll heaters. The answer further stated that during the year 1928 3,000 tons of crop end scrap had been shipped to the plaintiff or on its order, and that the shipments of crop ends for 1929 were at a rate in excess of the 1928 shipments.

After considerable testimony taken in open court, a decree was passed on the supplemental bill, wherein it was declared: (1) That as to all shipments of bundled sheets for steel

works the plaintiff should pay the quoted prices applicable to such shipments less $3.00 per ton, and that the defendant was not bound by the single quotation carried in the "Iron Age" for the Philadelphia market prior to January 31, 1929; (2) that the bundled sheets shown in evidence delivered in the months of May, June, and July, 1929, were not in fact new or old hydraulically compressed sheets for steel works; (3) that according to the true construction of the contract the crop end scrap shipped to the Van Allen Company was crop ends under the agreement between the plaintiff and defendant of September 30th, 1927; and (4) that the defendant should account to the plaintiff for the difference in price received from the Van Allen Company and what the plaintiff would have been required to pay under its contract; (5) that the plaintiff is entitled to an additional deduction of $2.00 per ton from the quotation for bundled sheets for steel works on such quantity of steel as may be shown to have been thrown loosely into the several cars, the amount of which has not been ascertained.

Considerable testimony was taken, the general effect of which was, on the part of the plaintiff, that although it has been buying thousands of tons of this product covering a period of six or seven years, the sheet steel scrap it received was so badly bundled as to be almost unfit for any kind of classification except loose scrap, and on the part of the defendant that it was so good it was entitled to receive the highest quotation in the "Iron Age" for new hydraulically compressed scrap. On the whole, our impression from the evidence is that the plaintiff has received substantially the same product from the defendant which the latter had been furnishing prior to the contract of September 30th, 1927. The evidence does not show that the defendant has been habitually throwing appreciable quantities of loose scrap into any of the cars with the exception of one car, into which an employee had emptied a box of loose scrap, unknown to any of the officials of the defendant, because the employee had immediate use for the box. According to the evidence, such loose scrap brings a price of $2.00 less than the bun-

dled sheets, and the allowance to which the plaintiff would be entitled for such loose scrap found in the cars can be easily adjusted.

It appears from the evidence that the sheet steel cuttings or waste from the defendant's mill is, and for several years has been, hydraulically compressed into bundles, dumped into cars, and shipped to steel mills, where it is taken from the cars placed in a charging box (usually by means of a magnet), and from the charging box it is dumped into a furnace to be remelted. Most of the defendant's product has been sold by the plaintiff directly or indirectly to the Bethlehem Steel Company at its Sparrows Point Mill, and, according to the testimony of Mr. Green, who does the purchasing for the Bethlehem Company, the bundling done by the defendant has been generally satisfactory. There were samples of bundling done by other mills offered in evidence, in comparison with which the defendant's bundles suffered. The other bundles were all smaller and could be much more easily handled, being about one-half the weight of the defendant's bundles. As compared with the samples of other mills, however, Mr. Green's testimony was that the defendant's bundles did not require so many handlings, and were of considerably greater density than those with which they were compared, and that on the whole the Eastern Rolling Mill bundle was a better bundle for the purpose of such a mill as that at Sparrows Point than the smaller and neater bundles of some other concerns. But these questions do not enter into the construction of the contract before us.

The plaintiff, for several years prior to the five-year contract of September 30th, 1927, had been buying the entire accumulation of sheet steel scrap from the defendant. It differed so in size from what has been testified to as the standard bundle that it became known among the customers of the plaintiff as "Eastern Rolling Mill" scrap, and had been so sold by the plaintiff, so that the subject matter of the contract between plaintiff and defendant was a distinct product, well known to both parties and was the thing about which they had dealt from year to year, so that the oft-

repeated rule of construction, as set out in *Nash v. Towne,* 5 Wall. 699, 18 L. Ed. 527, is particularly applicable here, and that is: "courts in the construction of contracts look to the language employed, the subject matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and the correct application of the language to the ends described." See *Davison Chemical Co. v. Baugh Chemical Co.,* 133 Md. 203, 211; 13 C. J. 542.

By the contract of September 30th, 1927, the plaintiff bought from the defendant its entire accumulation for five years, beginning October 1st, 1927, up to October 1st, 1932 (inclusive), of the defendant's "regular bundled steel scrap" at "the market price as quoted in the 'Iron Age' covering the Philadelphia market for bundled sheets (for steel works) * * * with a reduction of $3.00 per ton from this price," so that the customary product of the defendant was the thing which the plaintiff was buying, regardless of the kind of package that was made by anybody else anywhere, and it was being sold at $3.00 less than the quarterly quotation for "bundled sheets (for steel works)." At the time this contract was made this was the only quotation for the Philadelphia market contained in the "Iron Age," and the defendant now contends that because, beginning with January, 1929, the "Iron Age" added for the Philadelphia market quotations for hydraulically compressed sheets new and old, that these new quotations should be applied to the defendant's product if its bundles are hydraulically compressed.

According to our view it makes no difference what additional quotations may be made for any market. The thing concerning which the parties to this suit contracted at the time they entered into the agreement, and the method or basis adopted for the ascertainment of the price from time to time, are the controlling factors, and the construction will

be as of the time the contract was made and not according to some factors which may be imported into it by the acts of outside parties. "The object of the court in construing a contract is to ascertain and effectuate the intentions of the parties as appears from the whole of the agreement. The court will look at the time when and the circumstances under which the agreement was made, its subject matter, the relation of the parties and the objects to be accomplished, in order to ascertain the intentions of the parties." *Brantly on Contracts*, 2nd Ed. 282. We cannot, therefore, agree with so much of the decree appealed from as permits the application of any other quotation to the bundled scrap of the defendant than that which may appear from time to time in the "Iron Age" for the Philadelphia market on "bundled sheets (for steel works)." So far as the bundled scrap contract is concerned, during the life of this contract there is only one product and one price—that price to be fixed every three months in the manner provided for in the contract.

On the same day the bundled scrap contract was made, September 30th, 1927, a contract was made between the plaintiff and defendant for the purchase by the former and sale by the latter of the defendant's entire accumulation for five years of crop ends to be paid for at the price to be fixed quarterly for "No. 1 Heavy Melting Steel as quoted in the 'Iron Age' for the Philadelphia market with $3.00 per ton reduction from same." In the third paragraph of the decree the chancellor said, "By the true construction of the contract, crop end scrap includes all cuttings (from steel bars) regardless of length, that the defendant treats as scrap, as more fully set out in the opinion of the court, and that the material sold by the defendant to the Van Allen Company was crop end scrap." The testimony as to what are crop ends and as to the bars shipped to the Van Allen Company is very meagre. Simon Michlovitz testified that the crop ends his house had received over a period of several years was made up generally of pieces of twelve inches and less, but, in contradiction of this and to sustain his contention that he was entitled to the Van Allen shipments, he brought to court a

piece thirty inches long and said of such pieces, "In one car I might have got—well, I don't want to permit myself to say. I must have had five or six tons of—five or ten. Q. Five or ten tons of pieces like that? A. Yes, or maybe six tons." "I won't say thirty inches every piece. Some might have been thirty-two inches." Mr. Pennock, vice-president of the defendant, testified that the Van Allen shipment was the accumulation of the bars cut off the "regular bars from our rerolling. We used to use them for warming up on Sundays, but when we changed that practice we had an accumulation of those bar ends." He said they were sold in December, 1928, and had been accumulating since 1926. He said the lengths of bars they used in their sheet production ranged from twenty inches up to seventy-two inches, but that all bars under twenty inches were unusable and that these unusable lengths are known as "crop ends" and that the term "crop ends" in the trade does not include bars of usable lengths. Mr. Hazlett, president of the defendant company, testified that the lengths furnished the Van Allen Company varied from thirty to fifty inches. The price at which the pieces were sold to the Van Allen Company was $17.50, and at the time crop ends were sold to Michlovitz for $12. The price for steel bars at that time was $34. Fully one-half, perhaps more, of the Van Allen shipments were accumulating while L. J. Jones, who contracted with the plaintiff, was living, and the impression we get from both sides is that their relations were cordial, with no disposition on the part of Mr. Jones to withhold any scrap to which the plaintiff was entitled, and during this period of accumulation the defendant shipped to the plaintiff more than 3,000 tons of crop ends. It is not, therefore, easy to imagine that the defendant would have withheld such a relatively small amount of ends if it had regarded them as scrap. A complete answer to the question as to whether they should be regarded as scrap would have been some evidence as to the use to which they were put by the Van Allen Company. If that company used them as they were in their manufactures they would not be scrap and could not be treated as refuse or unusable. The

price paid was about $2.50 in excess of the price for bar or heavy melting steel in the Philadelphia market, and this would be some evidence that the Van Allen Company was merely buying usable lengths at a bargain. Mr. Pennock testified that they were usable lengths, and in the absence of any proof to the contrary the bars shipped to the Van Allen Company cannot be treated as scrap.

While the plaintiff in No. 80 appealed generally from the decree of the Circuit Court, in its brief it confined its objections to the interpretation of the contract and to the application of any other price for the defendant's bundled scrap than the "Iron Age" quotation "covering the Philadelphia market for bundled sheets (for steel works)," and to this extent the decree appealed from will be reversed. The Eastern Rolling Mill Company in No. 81 objected to all of the decree except the first paragraph, which declared the prices in the "Iron Age" for hydraulic compressed sheets (new and old) to be appliacble to the contract of the parties for the defendant's sheet steel scrap, and which we hold not applicable. The second paragraph, which holds the bundled sheets of the defendant already shipped to the plaintiff not entitled to be classified as hydraulically compressed sheets (new or old) will be affirmed. So much of paragraph three as holds the bars shipped the Van Allen Company to be crop end scrap will be reversed, and no accounting made for the same as provided by the fourth paragraph of the decree. The fifth paragraph, so far as the same fixes the differential per ton to be allowed to the plaintiff by the defendant for loose or unbundled steel sheets, will be affirmed, though further evidence is necessary to ascertain the number of tons on which such allowance shall be made. The sixth paragraph, denying the injunction prayed in the supplemental bill and denying the pecuniary decree prayed under the answer and cross bill of the defendant, is affirmed.

We find no reversible error in any exceptions to the rulings on the evidence. The defendant's exceptions were chiefly on the question of the classification of its sheet steel scrap, and, in view of our opinion that the defendant was bound

to furnish one kind of bundle and that to it there was to be applied the price for "bundled sheets (for steel works)," the evidence of the kind of bundling done by other mills would not be material.

> *Decree affirmed in part and reversed in part, each party to pay one-half the costs of both appeals, and case remanded for a decree to conform to this opinion, and for further proceedings as to tonnage of loose or unbundled steel sheets.*