BARNSDALL REFINERIES, Inc., v. BIRNAMWOOD OIL CO.

No. 5450.

Circuit Court of Appeals, Seventh Circuit.

Feb. 5, 1936.

Rehearing Denied March 20, 1936.

Clark M. Robertson, of Milwaukee, Wis., M. D. Kirk, of Tulsa, Okl., and Fraley N. Weidner, of Milwaukee, Wis., for appellant.

Carl N. Hill, John T. Harrington, and Harry Potter, all of Madison, Wis., for appellee.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

LINDLEY, District Judge.

Appellee, a wholesale dealer in gasoline and other petroleum products, brought suit in the District Court against appellant, a refiner of such commodities, upon a contract between the two, dated June 20, 1931, to recover the stipulated amount paid upon an alleged overcharge for "Be Square" gasoline purchased during the life of the contract. At the conclusion of the trial, the court directed a verdict for appellee and entered judgment for the stipulated amount.

The contract provided that appellee should buy and appellant should sell all gasoline and oils which appellee might require in its business, estimated as follows: Be Square gasoline minimum 65 tank cars; maximum 75 tank cars per year. Super-Gas Ethyl gasoline, minimum 3 tank cars, maximum 5 tank cars per year. It included certain other products. "Be Square" gasoline was defined as follows:

"This product shall be of similar quality to the regular 'Be Square Gasoline' distributed by the Seller throughout its marketing territory and shall conform substantially to the current specifications of 58-60 U. S. Motor Gasoline, except as same may be improved upon by the Seller."

The price to be paid for the same was fixed as follows:

"Price Be Square Gasoline. The Buyer shall pay to the Seller for 'Be Square Gasoline' in tank car lots, F. O. B. Group Three, Okla., the 'Spot Market' Price for 58-60 U. S. Motor Gasoline on date same is ordered shipped by the Buyer, arrived at in the following manner:

"By taking the high and low price in the Chicago Journal of Commerce and dividing by two."

From the time the contract was entered into until September 30, 1931, the Chicago Journal of Commerce carried but one quotation, namely, "58-60, 437 end point, U. S. Motor." Beginning October 1, 1931, and thereafter, until the time the suit was instituted, instead of one quotation, the Journal of Commerce carried three, substantially as follows: (1) 58-60, U. S. Motor, below 57 octane, (2) 58-60, 57-64 octane, and (3) 58-60, 65 and above octane. For a short period the quotations included also the designation "437 end point," and at certain times, the words "U. S. Motor" were omitted from the quotations because, as the editor stated, of space consideration; but they were implied in the quotations at all times and the trade apparently so understood. During the latter part of the period the designation "58-60" was omitted. These figures had to do with specific gravity measurements. "437 end point" had to do with temperatures at which, under a certain method of distillation, the last traces of material capable of volatization will heat the thermometer bulb. Octanes are units of measurement, under which is calculated the tendency of gasoline to knock, the higher the octane number, the higher the anti-knock value. The specifications of U. S. Motor gasoline are not definite but prescribe minimum limits. Prior to October 1, 1931, trade journals in their quota-

570

tions and the market generally took into consideration only gravity and end point requirements, but the industry had, preceding said date, already become interested in the octane rating rather than specific gravity rating or end point requirements.

It is undisputed that in the spring of 1931 a third grade gasoline came on the market, third because it was below the regular house brand product of each refiner, and, consequently, far below Ethyl gasoline. Prior to execution of the contract, appellant was already considering measuring its house brand gasoline, i. e., "Be Square" and its Ethyl or premium gasoline by octanes. The trade quite generally on October 1st reached a new basis for description of its product, namely, that of octane rating. About that time appellant determined the octane rating of each of its products and found that the house brand or regular gasoline, namely, its "Be Square" gasoline, fell in the rating of 57-64 octane; that the third grade gasoline fell below 57 octane; and that the premium or Ethyl gasoline fell in the high rating, 65 plus octane. The proof is clear that from time to time, after the changes in quotations, appellee ordered Be Square, Ethyl or premium gasoline, and third grade gasoline. The greater part of the demands of its customers was for Be Square gasoline, and most of its orders were for that product.

As a result of this situation in ordering Be Square gasoline, prior to the change in practice in the industry in adopting the new designations of these three brands and prior to the change in quotations in the Chicago Journal of Commerce, consistent with the change in practice, appellee encountered no difficulty in determining the price it should be charged. Appellee ordered "Be Square" gasoline. This was the regular or house brand product of appellant, and, as aforesaid, constituted the bulk of the refinery production. It came in direct competition with the regular house brands of other refiners, such as Red Crown, of Standard Oil of Indiana, and fell clearly within the quotation of the Chicago Journal of Commerce designated in the contract as the basis for the fixing of the price.

On October 1st, however, as we have seen, the quotation of the Journal of Commerce, mentioned in the contract as the measuring stick by which the price should be fixed, instead of one in number, became three in number, the difference in the three

grades being measured by octanes. Then arose the question which is now presented, viz., According to the quotations of which grade was the price of Be Square gasoline to be fixed? Whereas 58-60 U. S. Motor gasoline had been quoted in one quotation it was now quoted in three. Should appellee pay for its purchases of Be Square gasoline the low, medium, or high quotation?

The contract is clear to the effect that appellee was buying Be Square gasoline. Its orders clearly designated Be Square gasoline. Such gasoline conformed substantially "to the current specifications of 58-60 U. S. Motor gasoline" at the time the contract was executed. For this, under the contract, it was to pay the quotation upon the latter mentioned product in the Journal of Commerce. After the change in the additional quotations was made, the paper contained quotations of three grades of 58-60 U. S. Motor gasoline. The contract was still effective between the parties, but it became material, in order to carry out the intention thereof, to know which quotation covered the product specified in the purchase orders, namely, Be Square gasoline. Upon analysis, appellant found that its regular or house brand gasoline fell in the second bracket of quotations. It was between 57-64 octane. No other quotation included gasoline of the quality of Be Square gasoline. It promptly notified appellee to that effect, but the latter claims not to have observed the notice. The commodity purchased was the regular house brand product, Be Square gasoline, which was included within the single quotation prior to September 1st, but which was the second of the three grades quoted after October 1st. Appellee recognized this fact by ordering some smaller quantities of third grade and still smaller quantities of premium gasoline. When it ordered Be Square gasoline, it contemplated, as provided by its contract, that it would receive the regular house brand Be Square gasoline. This was in fact a 57-64 octane. Consequently, appellee received what it bargained for. There was delivered to it what it ordered, and it was charged for the same in accordance with the intent and meaning of the contract.

In this situation, the court erred, as a matter of law, in finding that the gasoline purchased fell within the lowest bracket. There was no proper evidence to support such finding, and the court should have directed a verdict for the appellant. In American Car & Foundry Co. v. East Jor-

dan Furnace Co., 275 F. 786, 789 (C.C.A. 7th), this court said: " 'The contract is still to be interpreted according to its true intent, although altered conditions may have varied the form of fulfillment.' Virginia v. West Virginia, 238 U.S. 202, 236, 35 S.Ct. 795, 809, 59 L.Ed. 1272." See, also, Michlovitz & Co. v. Eastern Rolling Mill Co., 158 Md. 486, 148 A. 836; Cobbs & Mitchell, Inc., v. Boyne City Tanning Co., 178 Mich. 88, 144 N.W. 487. Judgment should have gone for the appellant.

It is also argued that appellee, by its conduct, is estopped from claiming that it had been wrongfully overcharged for its purchases. In view of our conclusions, it is not necessary to pass upon this question.

The judgment will be reversed with costs.